# In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 03-1514, 03-1548

PRIMECO PERSONAL COMMUNICATIONS, LIMITED
PARTNERSHIP, d/b/a VERIZON WIRELESS,

*Plaintiff-Appellee, Cross-Appellant,*

*v.*

CITY OF MEQUON,

*Defendant-Appellant, Cross-Appellee.*

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 01-C-1205—**Lynn Adelman**, *Judge.*

ARGUED SEPTEMBEr 15, 2003—DECIDED DECEMBER 18, 2003

Before POSNER, KANNE, and ROVNER, *Circuit Judges.*

POSNER, *Circuit Judge.* One of the concerns that led up to
the enactment of the Telecommunications Act of 1996, 47
U.S.C. §§ 151 *et seq.*, was that zoning decisions by local
governments were unreasonably retarding the growth of
cellphone and other wireless services. Congress decided not
to preempt local regulation entirely, but instead (so far as
bears on this case) to require that the denial by a zoning
board or other state or local government body of a permit to

construct "personal wireless service facilities," such as an antenna high enough to be in the line of sight of cellphone users, as required for cellphone service, "shall be in writing and supported by substantial evidence contained in a written record." § 332(c)(7)(B)(iii); see, e.g., *VoiceStream Minneapolis, Inc. v. St. Croix County*, 342 F.3d 818, 829-32 (7th Cir. 2003). This requirement is enforceable by suit "in any court of competent jurisdiction." § 332(c)(7)(B)(v). But Congress did not prescribe a standard to guide the local authorities' determination whether to grant a permit.

Turned down by the planning commission of the City of Mequon, a suburb of Milwaukee, and on appeal by the City's board of zoning appeals (without opinion, so that the only written record of the evidence and reasoning supporting denial is the transcript of the planning commission's deliberations), for a permit to build an antenna in its preferred location, Verizon sued the City in the federal district court in Milwaukee. It contended that the denial of its application was not supported by substantial evidence. It based federal jurisdiction on the presence of a federal question, namely whether the City had complied with the provision that we quoted from the Telecommunications Act. The district judge granted summary judgment for Verizon and ordered Mequon to issue the permit. The City has appealed. Verizon has cross-appealed from the denial of attorney's fees.

The "substantial evidence" standard is conventionally used for judicial review of agencies' decisions, and though it is unusual for a federal court to be reviewing the decision of a nonfederal agency, we are given no reason to suppose that the term "substantial evidence" in the Telecommunications Act bears a different meaning from the usual one. And indeed we have held that it bears the same meaning. *VoiceStream Minneapolis, Inc. v. St. Croix County*,

*supra,* 342 F.3d at 830; *Aegerter v. City of Delafield,* 174 F.3d 886, 889-90 (7th Cir. 1999). So have the other federal courts of appeals that have considered the question. See *Preferred Sites, LLC v. Troup County,* 296 F.3d 1210, 1218 (11th Cir. 2002), and cases cited there. As there is no practical difference between the substantial-evidence standard and the even more familiar clearly-erroneous standard when the latter standard is used to guide the application of a legal standard to district court factfindings, *School District of Wisconsin Dells v. Z.S. ex rel. Littlegeorge,* 295 F.3d 671, 674-75 (7th Cir. 2002), and cases cited there, the question in this case comes down to whether the Mequon planning commission was clearly in error to turn down Verizon's application, in light of the evidence that had been placed before the commission.

A reasonable decision whether to approve the construction of an antenna for cellphone communications requires balancing two considerations. The first is the contribution that the antenna will make to the availability of cellphone service. The second is the aesthetic or other harm that the antenna will cause. The unsightliness of the antenna and the adverse effect on property values that is caused by its unsightliness are the most common concerns, as in *VoiceStream Minneapolis, Inc. v. St. Croix County, supra,* 342 F.3d at 831-32, and *Southwestern Bell Mobile Systems, Inc. v. Todd,* 244 F.3d 51, 61-62 (1st Cir. 2001). But adverse environmental effects are properly considered also, *360/ Degrees Communications Co. v. Board of Supervisors,* 211 F.3d 79, 82, 84 (4th Cir. 2000); cf. *AT&T Wireless PCS, Inc. v. Winston-Salem Zoning Bd. of Adjustment,* 172 F.3d 307, 315 (4th Cir. 1999), and even safety effects: fear of adverse health effects from electromagnetic radiation is excluded as a factor, 47 U.S.C. § 332(c)(7)(B)(iv), but not, for example, concern that the antenna might obstruct vision or topple over in a strong wind. See generally Timothy J. Tryniecki, "Cellular Tower

Siting Jurisprudence Under the Telecommunications Act of 1996—The First Five Years," 37 *Real Propery, Probate & Trust J.* 271, 279-84 (2002).

The balancing test can be refined a bit. The availability of cellphone service is a function of the number of existing service providers and the coverage and quality of service that the applicant could achieve by constructing his antenna in another location where its unsightliness (or other harmful effects, but none is suggested here) would be less of a problem or by sharing an already existing telecommunications tower. The unsightliness of an antenna depends on its height, thickness, and general appearance, the number of other antennas in the area, and the character of the area's land uses (for example, residential versus commercial), including the height of other buildings in the area. Coverage is a function of the number of providers, the coverage by each provider, and the increase in overall coverage at the disputed site if the antenna is built there, compared to alternative locations. Thus a new firm that has from a service standpoint two equally good alternative sites can rightly be compelled to place the antenna in the less conspicuous location, which might be an existing telecommunications tower. See *Metro PLS v. City & County of San Francisco*, 259 F. Supp. 2d 1004, 1010 (N.D. Cal. 2003).

Verizon was having trouble providing cellphone service along a stretch of a busy street called Mequon Road. A nearby church in an area zoned institutional, though largely residential, was willing for a price that Verizon was willing to pay to allow an antenna to be built in the church's backyard. The antenna would be 70 feet high and 9.5 inches in diameter (originally it was to be both higher and thicker, but its dimensions were changed in an unsuccessful bid to make it more palatable to the planning commission). To reduce its unsightliness, it would be disguised as a flagpole.

The planning commission hired a reputable telecommunications consulting firm to analyze the issue of availability of service. The firm reported that the antenna would increase Verizon's coverage of the area along Mequon Road from 37 percent of the area to 95 percent. Two alternative locations, one a high school and the other a country club, both of which the planning commissioners preferred to the church's backyard, were analyzed but were adjudged unsuitable. This was less because they would give Verizon coverage of only 72 percent of the Mequon Road area than because their proximity to other Verizon antennas would interfere with the service provided from those antennas.

The fact that Verizon would be unable to cover 95 percent of the area along the Mequon Road is not decisive evidence that denial of the permit would impair cellphone service. We do not know how many potential customers for such service there are in the area (including commuters and other transients as well as local residents), nor how many other providers of cellphone service serve them and with what quality of service and at what price. For all we know, the impact of the denial of the permit sought by Verizon would be negligible. But the only reason the planning commission gave for attaching little weight to the interest of cellphone users was that 72 percent coverage, while not 95 percent, is good enough—and in so reasoning the commission overlooked uncontradicted evidence that because of interference the quality of service in the area of the 35 percent increase in coverage (72 percent minus 37 percent) if the antenna were placed in an alternative location would be degraded. The City's brief states that "the greater the interference, the lower the coverage." That is not true. You could have 100 percent coverage, but lousy service because of interference. This concern seems not to have registered on the members of the planning commission.

Against the impact on Verizon's coverage the commission set aesthetic considerations. But no evidence or reasoned analysis can be found in the transcript of the commission's meetings, and except for the commission's letter turning down Verizon's application on the ground that alternative locations for its antenna were available (which is not denied—the issue is how inferior they are), that transcript is the only record of the basis for the commission's decision. We know that the church in the backyard of which Verizon wants to put its antenna is located in an area in which institutional land uses are permitted, though apparently residential uses predominate; but that is all we know, except the dimensions of the "flagpole" that Verizon wants to build. We are not told the height of any of the structures in the area, not even that of the church, which for all we know is 70 feet high or higher. We are not told why a 70-foot "light pole"—the disguise for the antenna that the commission suggested be used for the alternative site at the high school—would be less unsightly than the flagpole in the churchyard, or visible to fewer people.

The only "evidence" bearing on aesthetic considerations was the testimony of three or four residents that they don't like poles in general; they didn't say they would object to a flagpole in the church's backyard. If blanket opposition to poles could count as sufficient evidence for denying an application to build an antenna, the substantial-evidence provision of the Telecommunications Act would be set at naught. It is not sufficient evidence, as the cases make clear by saying that "generalized" aesthetic concerns do not justify the denial of a permit. *New Par v. City of Saginaw*, 301 F.3d 390, 398 (6th Cir. 2002); *Southwestern Bell Mobile Systems, Inc. v. Todd, supra*, 244 F.3d at 61; *Omnipoint Corp. v. Zoning Hearing Bd.*, 181 F.3d 403, 409 (3d Cir. 1999). Even the commission seems not to have taken this "evidence" seriously, for the City states in its brief that the planning

commission "did not base its denial [of Verizon's permit application] on local opposition to visual intrusion."

Several commissioners expressed "slippery slope" fears. They worried that if they approved Verizon's application, soon Mequon would be covered by a forest of telecommunications towers. Such fears are not completely groundless, though "forest" grossly overstates what lies at the bottom of the slippery slope. True, the more towers there are, the less the measurable effect of another tower on the character of the neighborhood—which may in any event have changed in the direction of commercial uses as the result of previous installation of towers. See *VoiceStream Minneapolis, Inc. v. St. Croix County, supra*, 342 F.3d at 830; *Second Generation Properties, Ltd. v. Town of Pelham*, 313 F.3d 620, 628 (1st Cir. 2002). But at the same time, the more towers there are, and therefore the more comprehensive the cellphone service available in Mequon, the weaker the argument for another tower based on a claimed need for wider coverage or greater competition. *Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 643 (2d Cir. 1999); *Metro PCS v. City & County of San Francisco, supra*, 259 F. Supp. 2d at 1010. There is no evidence of how many telecommunications towers there are in Mequon, however, and so the "slippery slope" argument can't get off the ground.

The commissioners invoked a preference for "collocation" (also and more illuminatingly spelled "co-location")—that is, for placing a new antenna in an existing telecommunications tower or other structure of the requisite height and capacity, such as a church steeple. Fair enough. But it is undisputed that Verizon had no suitable collocation opportunity. And the preference for collocation comes into play only when erecting an antenna in a new location is objectionable because of unsightliness or some other factor, and we have seen that there is no evidence that Verizon's

proposed flagpole would if erected in the churchyard be considered unsightly by the neighbors or have any other adverse consequences.

It is doubtful that the planning commission's decision can be said to be supported by any evidence at all; certainly it cannot be said to be supported by substantial evidence. That is in contrast to our recent decision in the *VoiceStream* case, which involved a proposed 185-foot communications tower in one of the most scenic regions of Wisconsin.

Since the problem with the commission's decision is not that the evidence shows that it was wrong but that the record contains insufficient evidence to have enabled the commission to make a responsible decision, it might seem that we should remand the case to the commission for further evidentiary proceedings. But the City has not requested such relief, and so the district court was right to order that the permit be issued. For completeness we note that both *New Par v. City of Saginaw, supra,* 301 F.3d at 399-400, and *Preferred Sites, LLC v. Troup County, supra,* 296 F.3d at 1220-22, together with cases cited in those two cases, express skepticism about the appropriateness of remands to local authorities, because of the delay in the final resolution of the dispute that a remand would cause; we needn't take a position on the issue in this case.

We turn to the cross-appeal. Verizon based its suit not only on the Telecommunications Act but also on 42 U.S.C. § 1983, which provides a federal civil remedy for the violation of federal rights, statutory as well as constitutional, under color of state law. Which is an apt description of what happened here: local officials violated a federal right of the plaintiff. And the prevailing party in a section 1983 suit is entitled by 42 U.S.C. § 1988, more or less as a matter of course, to the attorneys' fees reasonably expended by him in the suit.

We can assume that the various requirements for a section 1983 case have been satisfied, such as that, in a case in which the only defendant is a municipality rather than individual officers or officials of the municipality, the act challenged in the suit have been the act of the municipality itself, that is, an act done at the policymaking level of the municipal government or pursuant to a policy of that government, *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978); *Gernetzke v. Kenosha Unified School Dist. No. 1*, 274 F.3d 464, 468-70 (7th Cir. 2001), since, as *Monell* held, respondeat superior is not available in such suits. But we agree with the district court that section 1983 *remedies* are not available in a suit to enforce rights granted by the Telecommunications Act. *Nextel Partners Inc. v. Kingston Township*, 286 F.3d 687, 693-96 (3d Cir. 2002); *National Telecommunication Advisors, Inc. v. City of Chicopee*, 16 F. Supp. 2d 117, 121-23 (D. Mass. 1998).

The general rule in America (the "American" rule, as it is known) is that the prevailing party, whether plaintiff or defendant, is not entitled to an award of attorneys' fees. Verizon wants us to hold that any time Congress creates a right that is enforceable against state or local officials or agencies, section 1983, and its companion, section 1988, come in the door and the American rule goes out the window. No such purpose can be attributed to Congress. Section 1988 codifies the Civil Rights Attorney's Fees Awards Act of 1976, enacted in recognition that civil rights suits normally pit individuals, often socially marginal, unpopular, and impecunious, against well-funded public officers in cases whose social and political significance may dwarf the monetary stakes, which may be meager. These circumstances argue for awarding attorneys' fees in such cases, especially to prevailing plaintiffs, and that tilt has been ratified in the judicial interpretation of section 1983. The Telecommunications Act, in contrast to the federal

civil rights statutes, creates rights in telecommunications enterprises, which are usually substantial corporations, such as Verizon. They have the wherewithal to finance their own litigation without the boost given by fee-shifting statutes, and it would make no sense to carve an exception for cases in which they find themselves opposed not by other large corporations but by small towns, such as Mequon, population 21,000, with a planning commission some of whose members double as aldermen.

We acknowledge that the well-known "sea clammers" case, which held that when a federal statute creates a comprehensive scheme of enforcement the courts are not to supplement it with remedies drawn from other statutes, *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 20 (1981); see *Blessing v. Freestone*, 520 U.S. 329, 346-48 (1997); *Wright v. City of Roanoke Redevelopment & Housing Authority*, 479 U.S. 418, 423-29 (1987); *Smith v. Robinson*, 468 U.S. 992, 1009-13 (1984), is distinguishable. It is distinguishable because the Telecommunications Act is silent on remedies beyond merely conferring a right to sue to enforce the Act. However, such a conferral is presumed to entitle a successful plaintiff to the usual remedies, *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 66-76 (1992), which include damages as well as injunctive relief. Aided by the presumption, the enforcement scheme of the Telecommunications Act is complete (an entitlement to attorneys' fees not being a usual remedy under American law), and therefore general remedial statutes, such as 42 U.S.C. § 1983, which drags section 1988 in its wake, should not be fastened, barnacle-like, by judicial *Diktat*, to this new federal statute that creates rights overlapped by the existing remedial statutes. Otherwise when it enacts a new statute Congress will have difficulty knowing what remedies the courts will make available to the victims of statutory violations. If the statute doesn't specify any remedies, the

courts *have* to step in and make a guess as to what remedies will best implement the statutory scheme, but there is no need for that here. *Nextel Partners Inc. v. Kingston Township, supra,* 286 F.3d at 693-96; *National Telecommunication Advisors, Inc. v. City of Chicopee, supra,* 16 F. Supp. 2d at 121-23; see also *Boulahanis v. Board of Regents,* 198 F.3d 633, 639-41 (7th Cir. 1999); *Mattoon v. City of Pittsfield,* 980 F.2d 1, 5-6 (1st Cir. 1992).

AFFIRMED.

A true Copy:

    Teste:

                        _____
                        *Clerk of the United States Court of Appeals for the Seventh Circuit*