In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-3949

DAN HELCHER, et al.,

*Plaintiffs-Appellants*,

*v.*

DEARBORN COUNTY, INDIANA
BOARD OF ZONING APPEALS, et al.,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Southern District of Indiana, New Albany Division.
No. 4:06-CV-00102-SEB-WGH—**Sarah Evans Barker,** *Judge*.

ARGUED OCTOBER 31, 2008—DECIDED FEBRUARY 9, 2010

Before FLAUM, ROVNER and WOOD, *Circuit Judges*.

ROVNER, *Circuit Judge.* Cincinnati Bell Wireless, LLC ("Bell") applied for a conditional use permit to construct a wireless communication facility (essentially, a cellphone tower) on property owned by Dan and Merry Helcher

in Dearborn County, Indiana.[1] When the local Board of Zoning Appeals ("Zoning Board" or "Board") denied the application, Bell sued the Board and its members for violating various provisions of the Telecommunications Act of 1996, 47 U.S.C. § 332(c). The district court granted summary judgment in favor of the defendants, and Bell appeals. We affirm.

## I.

Bell, a wireless service provider, wanted to close a gap in cellphone signal coverage on a stretch of Jamison Road in Dearborn County, Indiana ("County"). The company sought to build a cellphone tower on the Helchers' land, a parcel zoned "Agricultural" under the Dearborn County Zoning Ordinance ("Ordinance"). Section 315 of Article 3 of the Ordinance required that Bell obtain a conditional use permit from the Zoning Board in order to build the tower at that site. R. 23, Ex. 1, at 1019. Article 15 of the Ordinance regulates the placement, construction and modification of cellphone towers in order to minimize their "negative impact on the character and environment of the County and to protect the health, safety and welfare of the public." R. 23, Ex. 2, at 1023. Article 9 of the Ordinance governs the use of land zoned Agricultural and allows non-agricultural uses (including the construction of telecommunications towers) under

---

[1] For the sake of brevity, we will refer to the plaintiffs collectively as "Bell." Their interests in the appeal are, for the most part, aligned.

certain circumstances.[2] The County employed two consultants to assist the Zoning Board in making decisions related to cellphone towers. Dick Comi of the Center for Municipal Solutions ("CMS") and Ron Ebelhar of H.C. Nutting Company ("Nutting") worked for approximately twenty months with Bell in preparing the application for a permit to build the tower. CMS and Nutting had assisted the Zoning Board in reviewing twelve previous conditional use permit applications relating to wireless facilities.

As required under the Ordinance, Bell engaged in a pre-application meeting with Ebelhar to discuss the proposed tower. At that August 11, 2004 meeting, Ebelhar identified eighteen requirements that Bell needed to address in order for its application to comply with the Ordinance. The plaintiffs claimed to work diligently to meet all of the relevant requirements, and on February 9, 2005, they submitted their application to Comi and Ebelhar for review. Comi responded on February 25, 2005, with a letter detailing fifteen insufficiencies with the application. Some of the items were simple documentary requirements such as signatures from land owners, and some concerns were more substantive calls for additional calculations, assessments, and reports. Bell provided supplemental information to the consultants

---

[2] The text of Article 9 was not included in the record on appeal, but was included in the County's appendix. The Ordinance in its entirety may be viewed at www.dearborncounty.org/planning/ Official_Documents.htm (last visited Jan. 12, 2010).

many times over the next several months in order to address the concerns raised in Comi's letter. Bell also made substantive changes to the plan, such as reducing the height of the tower from 250 to 190 feet, in order to eliminate the need to comply with the Federal Aviation Administration's requirements for lighting the tower. The revised plan also moved the tower further from the property line to comply with setback requirements. The consultants asked Bell to demonstrate that it could not "co-locate" the transmitters, that is, use already existing towers to provide coverage for Jamison Road. Bell investigated four existing wireless tower structures and rejected all of them as inadequate to provide the needed coverage. On January 23, 2006, Comi sent a letter to the County's Plan Commission stating that the consultants had completed their review of the application and recommended granting the conditional use permit to construct the tower on the Helchers' property.

The Zoning Board met on March 14, 2006 to consider the application. Ebelhar reported the findings of his review of the application and opined that Bell and the Helchers had met the requirements necessary to construct the tower, and that the Zoning Board should grant the permit. In every prior permit application for wireless coverage reviewed by the consultants, the cellphone carrier had been required to co-locate its transmitters on existing structures. This was the first instance since the inception of the Ordinance in which the consultants recommended that the Zoning Board allow construction of a new tower. A Board member asked Ebelhar about the visual impact of the tower, and he stated that it was the least intrusive tower

possible that would provide the needed service. Another Board member asked for clarification on who had performed the technical studies to determine whether the tower was necessary and Ebelhar confirmed that Bell had done the work and that Ebelhar's company had reviewed those studies.

A number of landowners who opposed the building of the tower spoke at the meeting to express their concerns about the visual impact of the tower and its detrimental effect on property values. A real estate appraiser addressed property values and concerns regarding potential hazards to children presented by the proposed tower. A community planner opined at the hearing that the plaintiffs had not met the requirements of the Ordinance because they had not provided a Visual Impact Assessment as required by paragraph 23 of Section 1512 of the Ordinance. The Zoning Board also considered a report filed by Wireless Applications Corporation, a consulting firm hired by two landowners, Karen and David Cody. The report conceded that the proposed tower would provide the desired coverage on Jamison Road but suggested that other sites could deliver superior service with a smaller impact on the surrounding community. An engineer from Bell rebutted that claim by noting that the tower height was necessary to provide adequate coverage and that Bell had reviewed and rejected as inadequate four alternate sites for the tower.

After the testimony, Zoning Board member Patricia Baker moved to deny the application for a special use

permit. By a vote of three to one, the Zoning Board denied the application. At the May 2006 meeting of the Zoning Board, many disputes arose during the process to approve the minutes of the March meeting. Members of the Zoning Board, representatives of Bell and the Helchers, and objecting landowners all suggested numerous revisions to the minutes. Unable to agree on many points, the Board tabled approval of the minutes until the next meeting. In early June 2006, the plaintiffs asked the Board not to approve the revised minutes and also requested that the Board reconsider its decision to deny the permit application. At the June meeting, the Board approved the minutes as revised ("Minutes") and denied the plaintiffs' request to reconsider the denial of the permit application.

The next month, Bell and the Helchers filed a complaint against the Board and its individual members, alleging several violations of the Telecommunications Act of 1996, 47 U.S.C. § 332(c) (the "Act"). Count I alleged that the Board's decision was not based on substantial evidence contained in a written record, as required by 47 U.S.C. § 332(c)(7)(B)(iii). Count II asserted that the approved Minutes of the March 14, 2006 Zoning Board meeting did not constitute a sufficient written decision as required by 47 U.S.C. § 332(c)(7)(B)(iii). In Count III, the plaintiffs contended that the Zoning Board's decision unreasonably discriminated against Bell, in violation of 47 U.S.C. § 332(c)(7)(B)(i)(I). Count IV maintained that the Zoning Board's decision had the effect of denying the provision of wireless communication services, in viola-

tion of 47 U.S.C. § 332(c)(7)(B)(i)(II). Counts V though IX, which are not at issue in this appeal, alleged violations of the Constitution and the civil rights of the applicants.

The district court granted the defendants' motion for partial summary judgment on the first four counts of the complaint. *Helcher v. Dearborn County*, 500 F.Supp.2d 1100 (S.D. Ind. 2007). The court rejected the plaintiffs' claim that the Zoning Board Minutes were an inaccurate recording of what went on during the meeting and that the Minutes were not adequate to meet the Act's require- ment that the decision be "in writing." The court found that a written decision was adequate so long as it informed the applicant of the local government's decision denying the application. In this instance, the court found, the meeting Minutes fulfilled this require- ment because the Minutes enabled the court to efficiently judge the Board's findings and conclusions against the record. The court also noted that the Minutes supplied the reasons underlying the Zoning Board's decision by noting the sections of the Ordinance which the appli- cants failed to satisfy. The court found that the Minutes allowed for meaningful judicial review of the decision, and that no more was required by the Telecommunica- tions Act. The court also found that the Zoning Board's decision was supported by substantial evidence, that the denial of the permit did not effectively prohibit the provision of wireless service, and that the Zoning Board did not unreasonably discriminate among wireless service providers. Bell appeals.

## II.

On appeal, Bell argues that the Zoning Board's decision does not comply with the "in writing" requirement of the Telecommunications Act, that the Board's decision is not supported by substantial evidence, that the denial of the permit effectively prohibits Bell from providing wireless communication services, and that the Zoning Board's decision unreasonably discriminated among wireless providers, all in violation of 47 U.S.C. § 332(c)(7). Before we address the merits of the arguments, we are obliged to address our jurisdiction. The defendants sought and the district court granted partial summary judgment in favor of the defendants on Counts I through IV of the complaint. As we mentioned above, the plaintiffs pled an additional five counts (Counts V through IX) alleging violations of the Constitution and of their civil rights. After the court entered its order granting partial summary judgment, the parties filed a "Joint Motion for Final Judgment." R. 47. In that motion, the parties expressed a "desire to [a]ppeal the Entry without the need to litigate their remaining claims at this time." R. 47, at 1. The plaintiffs agreed to dismiss without prejudice the remaining counts in exchange for a promise from the defendants to waive any statute of limitations defense if the plaintiffs later moved to reinstate those claims. The district court then entered a judgment dismissing Counts V through IX without prejudice and dismissing Counts I through IV with prejudice for the reasons stated in the court's earlier order granting partial summary judgment. The court stated that its earlier order

was "now made a final and appealable Judgment there being no just cause for delay in its entry." R. 49, at 1.

On appeal, both parties asserted that we have jurisdiction under 28 U.S.C. § 1291, which allows us to decide appeals of "all final decisions of the district courts of the United States[.]" The parties' agreement that "a judicial determination is a final decision (and thus appealable under Section 1291), does not make it so." *ITOFCA, Inc. v. MegaTrans Logistics, Inc.*, 235 F.3d 360, 363 (7th Cir. 2000). We have an independent obligation to determine our jurisdiction. *Id*. Whether a decision is final for the purposes of Section 1291 depends on whether the decision by the district court ends the litigation on the merits and leaves nothing for the court to do but execute the judgment. *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467 (1978); *ITOFCA*, 235 F.3d at 363. In this case, the court and the parties expressly reserved to the plaintiffs the right to reinstate Counts V through IX after the appeal. Thus, the judgment did not resolve the litigation on the merits, and Section 1291 may not supply jurisdiction.

Although the district court did not expressly invoke Federal Rule of Civil Procedure 54(b), the court's language tracks that rule, which allows entry of a final judgment on fewer than all of the claims "only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the

entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). We need not determine whether the judgment was properly entered under Rule 54, however, because after we raised this issue at oral argument, the parties entered a joint stipulation dismissing Counts V though IX with prejudice. That stipulation "wind[s] up the litigation and eliminat[es] the bar to our jurisdiction." *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 776-77 (7th Cir. 1999). We proceed then to the merits of the appeal.

## A.

The Act requires that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). Bell and the Helchers contend that the Zoning Board's decision does not comply with the Act's requirement that the decision must be "in writing." What is necessary for an adequate writing under the Telecommunications Act is an issue of first impression in our circuit.[3] There are differing views among the circuits as to what constitutes an adequate

---

[3] Although the Seventh Circuit has yet to rule on the "in writing" requirement, our own Judge Cudahy considered the question when sitting by designation on the Ninth Circuit. *See MetroPCS, Inc. v. City and County of San Francisco*, 400 F.3d 715, 721-23 (9th Cir. 2005) (Cudahy, J., writing for the panel). We are greatly aided by his analysis.

writing. *See MetroPCS, Inc. v. City and County of San Francisco*, 400 F.3d 715, 721-23 (9th Cir. 2005) (noting the circuit split on the issue); *New Par v. City of Saginaw*, 301 F.3d 390, 395 (6th Cir. 2002) (collecting the views of several courts); *Southwestern Bell Mobile Sys., Inc. v. Todd*, 244 F.3d 51 59 (1st Cir. 2001) (noting the broad range of interpretations of the "in writing" requirement in the district and circuit courts). Some courts require that local governments explicate the reasons for their decisions and link their conclusions to specific evidence in the record. *Omnipoint Commc'ns, Inc. v. Planning & Zoning Comm'n of Wallingford*, 83 F.Supp.2d 306, 309 (D. Conn. 2000) ("[a] local zoning authority must issue a decision in writing setting forth the reasons for the decision and linking its conclusions to evidence in the record"); *Illinois RSA No. 3, Inc. v. County of Peoria*, 963 F. Supp. 732, 743 (C.D. Ill. 1997) (the terms "in writing" and "written record" "plainly require the state or local governments to issue decisions regarding personal wireless service facilities in written form, stating the reasons for the decision, and providing written evidence or a written record of the proceedings that led to the government entity's decision"). On the other end of the spectrum is the Fourth Circuit, which accepted as adequate a stamp of the word "DENIED" on a zoning permit application. *AT&T Wireless PCS, Inc. v. Winston-Salem Zoning Bd. of Adjustment*, 172 F.3d 307, 312-13 (4th Cir. 1999) (writing the word "denied" on the face of an application to build a wireless communications tower is adequate to meet the "in writing" requirement); *AT&T Wireless PCS, Inc. v. City Council of Virginia Beach*, 155 F.3d 423, 429-30 (4th Cir.

1998) (finding that the "in writing" requirement was met by both the condensed minutes of a council meeting considering an application for a permit to build a tele-communications tower, and by the word "denied" stamped on a letter from the planning commission describing the application). In the latter case, the Fourth Circuit specifically rejected the contention that the writing must include a statement of "findings and conclusions, and the reason or basis therefor." *Virginia Beach*, 155 F.3d at 430.

In the middle are courts that strike a balance between a dubious, literal reading of the Act and a pragmatic, policy-based approach. The purpose of the "in writing" requirement is to allow for meaningful judicial review of local government actions relating to telecommunications towers. *USCOC of Greater Missouri v. City of Ferguson, MO*, 583 F.3d 1035, 1041 (8th Cir. 2009) (holding that the central concern of the "in writing" requirement is to enable effective judicial review of local government action); *MetroPCS*, 400 F.3d at 722 (Cudahy, J., sitting by designation) (same); *New Par*, 301 F.3d at 395-96 (same); *Todd*, 244 F.3d at 60 (same). The First Circuit found that there was no textual basis for requiring formal findings of fact and conclusions of law. *Todd*, 244 F.3d at 59. The court noted that local zoning boards are primarily staffed by laypersons and it would not be realistic to expect highly detailed findings of fact and conclusions of law. *Id*. On the other hand, the *Todd* court remarked, permitting local zoning boards to issue denials that offered no reasons for the decision would frustrate meaningful judicial review. *Todd*, 244 F.3d at 60.

The First Circuit therefore concluded that the written decision "must contain a sufficient explanation of the reasons for the permit denial to allow a reviewing court to evaluate the evidence in the record supporting those reasons." *Todd*, 244 F.3d at 60. The Sixth Circuit followed suit in *New Par*, requiring that a decision of a local government denying a request to place, construct or modify a wireless tower must describe the reasons for the denial and contain a sufficient explanation of those reasons to allow a reviewing court to evaluate the evidence in the record that supports those reasons. *New Par*, 301 F.3d at 395-96. *See also Sprint Spectrum, L.P. v. Platte County, MO*, 578 F.3d 727, 732 (8th Cir. 2009) (assuming without deciding that the correct standard for the "in writing" requirement is the one expressed in *MetroPCS*, *New Par*, and *Todd*).

We join the First, Sixth and Ninth Circuits, the majority of the courts that have reached this issue. The "in writing" requirement is met so long as the written decision contains a sufficient explanation of the reasons for the permit denial to allow a reviewing court to evaluate the evidence in the record supporting those reasons. This standard is not unlike our Circuit Rule 50, which requires district judges to provide reasons for decisions that resolve any claim on the merits or terminate the litigation. Circuit Rule 50 "serves three functions: to create the mental discipline that an obligation to state reasons produces, to assure the parties that the court has considered the important arguments, and to enable a reviewing court to know the reasons for the judgment." *DiLeo v. Ernst & Young*, 901 F.2d 624, 626 (7th Cir. 1990). As

we discussed above, the primary purpose of the "in writing" requirement for the Telecommunications Act is to allow for meaningful judicial review of the decisions of local governments. Keeping in mind that local zoning boards typically are not populated with lawyers much less judges, we cannot expect something akin to a judicial opinion. Therefore, a decision "in writing" is adequate if it provides an explanation that allows us, in combination with the written record, to determine if the decision is supported by substantial evidence.[4]

With that standard in mind, we turn to the decision issued by the Zoning Board. The "writing" issued by the Board is the seventeen-page "Zoning Board of Appeals Minutes" for the March 14, 2006 meeting (the same Minutes we referenced earlier). Because the contents of the Minutes will also be relevant to whether the decision was supported by substantial evidence, a question we consider below, we will recount the Minutes in some

---

[4] Not every failure to meet the standard set in Circuit Rule 50 requires remand. *See United States v. Forman*, 553 F.3d 585, 590-91 (7th Cir.), *cert. denied*, 129 S. Ct. 1924 and 129 S. Ct. 2817 (2009) (noncompliance with Circuit Rule 50 does not always prevent judicial review because the district court's reasoning may be apparent from the record); *Stoller v. Pure Fishing Inc.*, 528 F.3d 478, 480 (7th Cir.), *cert. denied*, 129 S. Ct. 609 (2008) (no remand for compliance with Circuit Rule 50 is necessary when the district court's reasoning is clear from both the record and the court's brief statement). Similarly, not every failure to meet the standard we have set for the "in writing" requirement will require reversal or remand.

detail. The discussion of Bell's application began with the Zoning Board's Enforcement Officer describing the Helchers' land and setting forth the criteria to be used to evaluate the requested permit (including Articles 3 and 15 of the Ordinance). The Enforcement Officer also reviewed a Staff Report and Site Plan (both of which were attached to the Minutes and included in the record), and presented the results of a balloon test at the property. Ebelhar, the consultant hired by the Zoning Board, then presented his recommendation that the permit be approved. Ebelhar opined that the applicants had met the criteria for constructing the tower, and that the tower was needed to close a gap in coverage. Steve Carr, a representative of Bell, then testified that co-location was not possible in this instance, that the tower would be safe, that little traffic would be generated by the tower, that there was no way to hide the structure from view, that the site would not encroach on private property, and that the tower would operate within FCC requirements. In response to questions from Board members, Carr also testified that the site was chosen because it was high enough to overcome issues with tree foliage and winding roads, that other sites were not adequate, that the tower presented no health-related risks linked to tower transmissions, and that the reduced 190-foot height of the tower would be adequate even though a 220-foot tower would be optimal. Another Bell representative confirmed that Jamison Road coverage was the primary objective of the tower, and that this road was heavily traveled.

The Minutes next detailed the objections of David and Karen Cody, residents of a subdivision situated adjacent to the area where the proposed tower would be constructed. The attorney for the Codys submitted a written statement and introduced a community planner and professional property appraiser, both of whom testified later in the hearing. The Codys, through their attorney, did not dispute the quality of the signal on Jamison Road, the structural integrity of the proposed tower, or the fact that the Helchers' property had no particular historical significance. The Codys' attorney instead contested the qualifications of Nutting to study, review and report on technical issues such as propagation maps. She also asserted that the Act required a wireless provider to demonstrate that the gap in coverage existed not for one provider but for all providers. She contended that the Act required wireless providers to prove that they are filling gaps in the least intrusive manner by looking at all alternatives and ruling out other options. She also noted that the Act allowed local governments to regulate the placement of towers, taking into account construction, location, aesthetic requirements, visual judgments and the effect on property values. The Codys, representing a large number of residents in the area of the proposed tower, presented photographs of several properties, showing what the tower would look like from many nearby residences. They opined that the tower would be in the most visually intrusive location possible, and presented software-enhanced photographs based on those taken during Bell's balloon test, modified to show a scaled, graphical representation of the

proposed tower. After the Codys expressed their fear that their property value would decrease significantly, eight other residents spoke about their fears that the tower would reduce their property values, change the character of the neighborhood, and be visually intrusive. The residents also questioned the necessity for the tower, whether co-location had been adequately considered, and whether the loss in property values would also result in a loss to the county tax base.

The Codys' attorney then proffered additional objections to the issuance of the permit. First, she asserted that Bell had failed to submit a completed application prior to the agenda deadline for the meeting. Second, she maintained that the Zoning Board should not accept new information submitted by the applicant at the meeting. Third, she noted that although Bell had adequate time to complete its application and supply all information required by the Ordinance, the company had failed to do so. She alleged that the application was inaccurate or incomplete on its face because the property owners had not signed it, because the proposed lease between the Helchers and Bell was not signed by Bell and thus Bell had no property interest in the area, and because Bell's agent signed as "Applicant" in violation of the certification on the face of the application. She asserted that the application did not meet the requirements and purposes of Article 15. In particular, aesthetic considerations had been largely ignored. Bell had not responded to a request for information from the County's agent about the necessity of the tower, in violation of Paragraph 1 of Section 1512. Moreover, the application failed

to meet the requirement of Section 1512, Paragraph 7, requiring the applicant to show the location of the nearest resident. The application also failed to conform to Section 1512, Paragraph 21, which required a written report demonstrating meaningful efforts to secure shared use of towers or the use of alternative buildings or structures.

She noted that the application did not explain why an agricultural site was needed, given that Section 1514 of the Ordinance required applicants to demonstrate why seven other categories of property were inadequate before agricultural land could be employed for this purpose. She also remarked that Section 1514 required the applicant to prove that the cell tower was not harmful to the nature and character of the neighborhood or community, and stated that the residents' objections demonstrated that the applicants had not met this provision. The Codys' attorney also presented the report of Wireless Applications Corporation, a consulting firm contacted by the Codys. Wireless Applications reviewed Bell's application and concluded that the Helchers' property did not serve the best interest of the community. The consultant suggested alternate sites for the tower and also recommended that the tower height could be reduced to 150 feet with a negligible difference in signal coverage.

The certified real estate appraiser introduced by the Codys' lawyer testified that, in his opinion, the proposed tower would negatively impact property values, although he conceded he could not predict the degree of impact. The community planner then testified that the

applicants failed to meet the standards in Article 15, Section 1512, Paragraph 23, which required the applicants to submit an environmental impact assessment, including a visual impact assessment that analyzed the visual effect on adjoining properties. In fact, the visual impact assessment submitted did not acknowledge that the tower would be visible from residential areas but instead indicated it was adjacent to undeveloped wooded land.

At the end of all testimony, each of the five members of the Zoning Board spoke about the application. The Chair, Jim Deaton, remarked that the application did not comply with Article 3, Section 315, items (b) and (d), which concerned the effect of the tower on the appearance and character of the surrounding area, as well as the normal and orderly development and improvement of surrounding property. Board member Jake Hoog concurred with the Chair's assessment that the application did not comply with Article 3, Section 315(b). Board member Patricia Baker agreed that the placement of the tower would impede the development and improvement of surrounding properties in violation of Section 315(d). Board member Mike Hall questioned whether Bell had in fact considered other areas for placement of the tower. The final Board member, Jane Ohlmansiek, asserted that, although the tower would not adversely affect the surrounding area in some respects, it would not be harmonious to the existing development of surrounding properties. She also opined that the applicants had not presented an adequate visual impact study to the Zoning Board.

At the conclusion of all discussion, Zoning Board member Baker moved to deny the application for the conditional use permit to construct the tower at the Helchers' property because of the applicants' noncompliance with Article 3, Sections 315(b) and 315(d); and Article 15, Section 1514, subparagraph 5 of the Ordinance:

> Ms. Baker then made a motion to deny the application for the Conditional Use request to establish a wireless telecommunications facility on Losekamp Road as a result of the Applicant's noncompliance with the following ordinances: Article 3, Section 315, Item b, which states that the facility will be designed, constructed, operated, and maintained so as to be harmonious and appropriate in appearance with the existing or intended character of the general vicinity and which shall not change the essential character of the area; Article 3, Section 315, Item d, which states that the facility will not impede the normal and orderly development and improvement of the surrounding property for uses permitted in the district; and Article 15, Section 1514, Sub 5 in which the Applicant conflicted with the provisions of the Zoning Ordinance by failing to adequately illustrate that all other hilltops and potential sites in the area had been investigated.

R. 23, Ex. 28, at 1706. Three members of the Board voted in favor of the motion and one opposed it. The Chair did not vote because the Board's rules permit the Chair to vote only to break a tie. The motion passed and the permit was denied.

The question is whether the Minutes, which we have just summarized, present an adequate basis for judicial review of the Board's decision. We find that the Minutes are sufficient for that purpose. Our task on appeal is to determine whether substantial evidence in the record supports the Board's decision. 47 U.S.C. § 332(c)(7)(B)(iii). The Minutes clearly delineate the issues that arose with the application, the evidence that was presented by both the applicants and by the residents to the Zoning Board, the concerns of the applicants and residents of the area, and the concerns of the Board members. The Minutes also cite the specific provisions of the Ordinance that the majority of the voting members found were not met by the application. The Minutes thus provide an explanation that allows us, in combination with the written record, to determine if the decision is supported by substantial evidence. *See MetroPCS*, 400 F.3d at 722; *Todd*, 244 F.3d at 60. In fact, the Minutes provide a great deal of detail about the evidence and the applicable Ordinance provisions. *See Platte County*, 578 F.3d at 732 (finding a written decision adequately explained that it was rejecting a proposed tower for aesthetic reasons where the decision explained that the local government objected to the tower because its size, location and relationship to the surrounding screening and landscape were such that the tower would dominate the immediate neighborhood so as to prevent development and use of neighboring property); *MetroPCS*, 400 F.3d at 723 (affirming that a decision met the "in writing" requirement when it summarized the facts of the dispute, recounted the proceedings, articulated the reasons for rejecting

an application and explained the evidentiary basis for the ruling); *New Par*, 301 F.3d at 396 (finding a decision did not meet the "in writing" requirement when it did not contain any explanation of the reasons for the denial but simply stated the request was denied "based on the facts presented and the Board's determination"); *Todd*, 244 F.3d at 60 (finding adequate a written decision that "offers little explanation and few facts" because the reasons were stated with sufficient clarity to permit an assessment of the evidence in the record supporting the reasons). On the threshold question of whether the Minutes met the "in writing" requirement, we conclude that the Minutes met the standard we set forth above.

**B.**

Bell and the Helchers next contend that the Zoning Board's decision denying their application for a conditional use permit was not supported by substantial evidence. Recall that the Telecommunications Act requires that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). The substantial evidence standard is highly deferential to the local government making the decision. *VoiceStream Minneapolis, Inc. v. St. Croix County*, 342 F.3d 818, 830 (7th Cir. 2003). We apply the same test for substantial evidence under the Telecommunications

Act that we apply in our review of the decisions of administrative agencies. *PrimeCo Personal Commc'ns, L.P. v. City of Mequon*, 352 F.3d 1147, 1148 (7th Cir. 2003); *VoiceStream*, 342 F.3d at 830. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *VoiceStream*, 342 F.3d at 830 (quoting *Aegerter v. City of Delafield, WI*, 174 F.3d 886, 889 (7th Cir. 1999)). The party seeking to overturn the local zoning board's decision has the burden of proving that the decision is not supported by substantial evidence. *VoiceStream*, 342 F.3d at 830. We have found that there is no practical difference between the substantial evidence standard and the clear error standard, and so the relevant question is whether the Zoning Board clearly erred in refusing to issue the permit. *PrimeCo*, 352 F.3d at 1149. The Zoning Board rejected the plaintiffs' application for a conditional use permit because the application did not comport with three provisions of the Ordinance. In particular, the Zoning Board found that the application did not satisfy Article 3, Sections 315(b) and (d), and Article 15, Section 1514(5). We will examine, in turn, what evidence in the record supported the Board's decision as to each of these provisions.

**1.**

Section 315(b) states that the Board has the power to authorize a conditional use permit so long as the conditional use "[w]ill be designed, constructed, operated, and maintained so as to be harmonious and appropriate in appearance with the existing or intended character of

the general vicinity and shall not change the essential character of the same area." R. 1, Ex. B, at 9. Although local governments are entitled to weigh the aesthetic effect of a wireless tower in deciding whether to permit its construction, generalized aesthetic concerns are not alone sufficient to justify a denial of a permit. *PrimeCo*, 352 F.3d at 1150. *See also VoiceStream*, 342 F.3d at 831 (because few people would argue that telecommunications towers are aesthetically pleasing, a local zoning board's aesthetic judgment must be grounded in the specifics of the case). A blanket opposition to poles, for example, would not be sufficient evidence for denying the construction of a wireless facility disguised as a pole. *Id*. A reasonable decision whether to approve a permit to construct a cellphone tower requires the local government to balance the contribution the tower would make to the availability of cellphone service against the detriments the tower presents to the surrounding community. *PrimeCo*, 352 F.3d at 1149. The complaints made by local residents in this case are representative of the downsides towers present. They often are perceived as unsightly and are blamed for reducing property values. Although the statute prohibits as a consideration the fear of adverse health effects of electromagnetic radiation from the towers, a local government may consider other safety factors, such as the harm to the environment, the obstruction of vision, and the risk of a tower falling due to wind or ice. *PrimeCo*, 352 F.3d at 1149.

Bell again points to the experts' opinion that there was no less visually intrusive location on which to place the tower as an indication that the Board's findings

under Section 315(b) were not supported by substantial evidence. Bell discounts the photo simulations presented by the Codys and other residents as "generalized" objections to towers. Bell conducted a "balloon test" at the proposed site and provided photographs to the Board. A large helium balloon was floated to the height of the proposed tower and photographs were taken at various distances and angles. The Codys then used those photographs to extrapolate views of the tower from their property and from other nearby residences and farms. The Codys presented these photo mock-ups to demonstrate to the Board that the tower was not harmonious in character to the surrounding area. Many of the nearby homeowners also wrote letters to the Board protesting the impact of such a structure on the scenery and on their property values. Bell and the Helchers provided photos taken largely from public roads but the Codys and other nearby residents presented views of the tower and the balloon test from farms and residences nearby. R. 23, at 1465, 1491-1495, 1501-1563. In the Codys' altered photos, the tower rises up like a nineteen-story Martian machine from H.G. Wells' "War of the Worlds," marring a landscape of forests and farms. The tower is not in any way disguised to resemble a more palatable structure, but stands out alone as an industrial blemish on an otherwise bucolic landscape. It is remarkably out of scale to any surrounding structures. Of course, Bell argues that the height is necessary given the topography of the county, and also contends that the company reduced the height of the tower as much as possible without degrading the signal.

The photographic representations of the tower as viewed from the property of the Codys and other neighbors, accompanied by the objections of many residents who purchased land and built homes in this area specifically because of the natural views, provided the Zoning Board with substantial evidence to reject the permit as non-conforming with Section 315(b). The Zoning Board weighed the value of closing a signal gap for one wireless provider along a stretch of road against the aesthetic effect this tower would have on this largely rural setting and found that this tower at this location was not harmonious with the appearance or intended character of the area.

As we discuss below, Bell had not satisfied the Board that it had adequately considered placing the tower on land zoned for manufacturing, business, or for highway interchanges. It is not surprising that a 190-foot industrial-looking tower would not be harmonious with an agricultural setting, and that is likely one of the reasons that the Ordinance insists that wireless providers consider seven other categories of zoned property before resorting to placement on agricultural land. Bell compares the Board's rejection of the permit to the city's rejection in *PrimeCo*. But in *PrimeCo*, the citizens objected to placement of a tower disguised as a flagpole in an area where industrialized land uses were permitted, and where there was no evidence that the height of the pole (70 feet in that instance) was out of character for the area. Moreover, the city had suggested instead disguising the tower as a light pole and moving it to a different location, even though there was no evi-

dence that a light pole was any less unsightly than the proposed flag pole and no evidence that the light pole would be less visible than the flag pole. *PrimeCo*, 352 F.3d at 1150-51.

The circumstances here more closely resemble those of *VoiceStream*, where the local government denied a permit to build a tower near a scenic river way. We noted that the county's determination that the proposed tower would adversely affect the aesthetic harmony of the river way was grounded in the specifics of the case and was not based on conjecture or speculation. Rather it was based on an on-site investigation and a map prepared from the wireless carrier's crane test, documenting how visible the tower would be from various nearby locations. *VoiceStream*, 342 F.3d at 832. Persons who viewed the crane test, which was similar to the balloon test in the instant case, testified to the negative impact the tower would have. This testimony and the map prepared from the crane test provided substantial evidence to support the county's decision to deny the permit for the tower. *Id*. Although the Helchers' property is admittedly not on a National Scenic Riverway, it is in a picturesque rural area where a 190-foot structure would rise high above the tree line, completely out of character with any other natural or man-made structure in the vicinity.[5] We conclude therefore that substantial

---

[5] We note that the Helchers own and operate a commercial storage building on their property, and are authorized to

(continued...)

evidence supported the Board's decision to reject the permit on this ground. *See Sprint PCS Assets, L.L.C. v. City of Palos Verdes Estates*, 583 F.3d 716, 726 (9th Cir. 2009) (holding that a board's decision to reject a permit on aesthetic grounds was supported by substantial evidence where the evidence included propagation maps, mock-ups of the proposed tower, a report on the aesthetic values at stake, public commentary and a presentation from the wireless carrier); *Platte County*, 578 F.3d at 733 (finding that a visit to the proposed tower site, an aerial map indicating surrounding homes and the residential character of the area, letters from three nearby residents, and simulated pictures of the proposed 153-foot tower supplied substantial evidence to support a decision rejecting a tower for aesthetic reasons); *T-Mobile USA, Inc. v. City of Anacortes*, 572 F.3d 987, 994 (9th Cir. 2009) (objections by residents that a monopole would have a detrimental impact on surrounding residential property, that the pole would not be completely screened, and that it would interfere with scenic views provided substantial evidence supporting a denial of a permit to build the pole); *Omnipoint*, 430 F.3d at 534 (holding that a local zoning board has discretion to rely on the aesthetic objections raised by neighbors who know the local terrain and the sight lines of their own homes, and may

---

[5] (...continued)
build up to twenty-two storage spaces, each eleven feet by eleven feet in size. A relatively small commercial storage building of limited height is far less visible to neighbors than a 190-foot tower.

reject aesthetic opinions of experts whose study included only views from public areas and not from residents' property).

**2.**

Section 315(d) similarly empowers the Board to issue a conditional use permit if the use "[w]ill not impede the normal and orderly development and improvement of the surrounding property for uses permitted in the district." R. 1, Ex. B, at 9. The Codys testified that they halted construction on an addition to their home when they learned that the tower might be built nearby. A real estate appraiser testified that the tower would have a detrimental effect on land values, although he could not offer any specific measure of the predicted downward trend. This is the thinnest part of the county's case, and this factor alone may not have provided substantial evidence for the decision to deny the permit. We need not decide what would be needed to meet the substantial evidence standard in this instance, though, because the county's conclusion that the tower would be incompatible with the appearance and character of the area and its conclusion that the plaintiffs had failed to adequately investigate other kinds of zoned land were supported by substantial evidence.

**3.**

Section 1514(5) provides that the County may disapprove an application that, among other things, "[c]onflicts

with the provisions of this Ordinance." R. 23, Ex. 2, at 1033. Section 1514 supplies a list of nine categories of property on which wireless transmitters may be placed, in the order of the County's preference. The County prefers, in order from most to least favored, that transmitters be placed (1) on existing towers or structures without increasing the existing height of those towers or structures; (2) on property zoned Manufacturing Three; (3) on property zoned Manufacturing Two; (4) on property zoned Manufacturing One; (5) on property zoned Highway Interchange; (6) on property zoned General Business; (7) on property zoned Restricted Business; (8) on property zoned Agricultural; and (9) on property zoned Residential. R. 23, Ex. 2, at 1032. The Helchers' property was zoned Agricultural, second to the last on the County's list of preferences. Only residential neighborhood placement is more offensive to the County's stated values than the location selected by the plaintiffs here. Section 1514 requires applicants seeking to place towers on lower priority land (such as Agricultural land) to submit a detailed explanation as to why a higher priority site was not selected. R. 23, Ex. 2, at 1032-33.

Although Bell arguably has explained why co-location was not possible in this instance, the company has not provided a detailed explanation regarding land categories (2) through (7) above.[6] As the district court noted, the

_____

[6] The application considers each possible co-location site and explains why it is inadequate to provide coverage for Jamison

(continued...)

plaintiffs did not explain why a transmitter could not be constructed on property zoned Manufacturing One, Two or Three; Highway Interchange; General Business or Restricted Business. Instead, the plaintiffs simply recited boilerplate claims in their application for each of these preferred categories of zoned property:

> Within or in reasonable proximity of the search area where new antennae is [sic] required to provide complete and competitive coverage there exists no property zoned [zoning designations (2) through (7)] that accommodates the RF engineering requirements of the proposed Cincinnati Bell Wireless network expansion.

R. 23, Ex. 10, at 1309-10. As the district court noted, these "generic, nonspecific statements are unsupported by any explanation, evidence of investigation, or other description indicating that credence is to be granted to Plaintiffs' claims that all other sites were adequately investigated." *Helcher*, 500 F.Supp.2d at 1117.

Bell and the Helchers continue to rely on these unsupported statements on appeal. Bell characterizes its conclusory statements as "uncontradicted evidence" that Bell "has investigated all feasible alternate locations," and faults the Board for failing to offer alternate sites. Appellant's Brief at 21. This is nothing more than an attempt

---

[6] (...continued)

Road. The Board rejected the application, in part, because Bell failed to show that six *other* preferred categories of zoned property could not be used.

to reverse the burden of finding alternate sites onto the Zoning Board and its officers, a burden the Ordinance places squarely on the applicant for a conditional use permit. Bell also argues that the district court and the Zoning Board ignored the numerous propagation maps and RF data provided by Bell, contending that these documents identified the area in which the tower must be placed to provide adequate coverage. According to Bell, the Board's experts knew from those maps and documents which locations should be investigated, and neither the Board nor the court had the expertise required to evaluate the maps and data. At the Zoning Board meeting, a Bell representative addressing this question offered the following testimony to support the company's compliance with Section 1514:

> The other area with which to review a wireless communications tower request is your checklist of certain zoning classifications. Rather than going through that long process of explaining all that, I will simply refer to Tab 13 that we submitted, and also reiterate the fact that Cincinnati Bell Wireless would not be here unless there was a definite need for this facility to be located here. We take every angle and every avenue to co-locate on existing structures of height whether it be water tower, existing cell tower, rooftops, whatever. If we can utilize and enhance our network by not having to go through a long zoning process, we're going to go through that process because it's all about servicing the customer, because it is a customer-based business. So, I would just refer to chapter—Section 13 that we submitted in writing

and ask that you list that as the findings established with Article 15, Section 1514.

R. 23, Ex. 29, at 1721, Tr. at 58. Tab 13 is simply the document containing the conclusory statements that no land zoned in the preferred categories would accommodate the engineering needs of the proposed tower. In that document and in other documents, Bell made a good case for ruling out co-location on existing towers or structures, but Bell has yet to point to anything specific showing the company even considered much less ruled out land in the other categories. Without pointing to zoning maps or an overlay of zoning maps and propagation maps, for example, the company essentially argues, "Trust us; we looked." Bell's argument amounts to a claim that the Board and the district court were required to rubber-stamp the experts' conclusory statements that no land zoned in the other six categories would have satisfied the technical specifications. Neither the Board nor the court were required to accept unsupported opinions. Given that the only "evidence" that Bell satisfied Section 1514 consists of Bell's conclusory statements, we conclude that the Board's decision rejecting the permit for noncompliance with Section 1514 is supported by substantial evidence.

### C.

Bell contends that the Board's rejection of its application effectively prohibits Bell from providing wireless communications services. Bell also argues that the Board's denial unreasonably discriminates between wire-

less providers. Neither of these arguments has merit. Our review of the prohibition-of-service claim is *de novo*. *VoiceStream*, 342 F.3d at 833 (whether a particular zoning decision violates the Act's anti-prohibition clause is a question that a district court determines without deference to the local zoning board, and an appellate court's review of a grant of summary judgment on this issue is *de novo*). We considered the meaning of the anti-prohibition clause in *VoiceStream* and concluded that "so long as the service provider has not investigated thoroughly the possibility of other viable alternatives, the denial of an individual permit does not 'prohibit or have the effect of prohibiting the provision of personal wireless services.' 47 U.S.C. § 332(c)(7)(B)(i)(II)." *Voice-Stream*, 342 F.3d at 834-35. In *VoiceStream*, we joined the First Circuit in holding that a provider carries a heavy burden of demonstrating not just that the application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try. *VoiceStream*, 342 F.3d at 834 (*citing Second Generation Props., L.P. v. Town of Pelham*, 313 F.3d 620, 629 (1st Cir. 2002)). "Under this standard, the provider must show that its 'existing application is the only feasible plan' and that 'there are no other potential solutions to the purported problem.'" *VoiceStream*, 342 F.3d at 834 (citing *Town of Pelham*, 313 F.3d at 630, 635). As we noted above, Bell did not demonstrate to the Board's satisfaction that it had investigated not only co-location but also six other categories of zoned land before applying to place the tower on the Helchers' agricultural property. That failure to satisfy Section 1514 of the Ordinance demon-

strated that the applicants did not meet the standard set under *VoiceStream* for a prohibition-of-service claim.

Finally, Bell has failed to demonstrate that the Board unreasonably discriminated among providers by denying the permit. The Act provides:

> The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof . . . shall not unreasonably discriminate among providers of functionally equivalent services[.]

47 U.S.C. § 332(c)(7)(B). We have yet to address what is needed to make out a claim under this provision of the Act. Bell contends that the Board's denial of its permit application left Bell unable to provide viable competition to other carriers in Dearborn County. But Bell has not alleged, much less presented evidence, that the Zoning Board treated any other carrier more favorably. There is no allegation, for example, that other carriers were allowed to construct towers on land zoned agricultural. The only evidence in the record regarding the Board's treatment of other carriers is the undisputed statement from the Board's expert, Ebelhar, that every other carrier that applied for a permit to build a new wireless tower in Dearborn County since the Ordinance went into effect had been required to co-locate on an already existing tower. R. 23, Ex. 29, at 1718, Tr. at 46. It is difficult to see how Bell can make a claim that these other carriers were treated more favorably when none had been allowed to build a new tower since the inception of the Ordinance.

Courts interpreting this provision require the plaintiff to demonstrate that the carriers are functionally equivalent, that the local government treated another carrier more favorably, and also that the favorable treatment was unreasonable. *See Ogden Fire Co. No. 1 v. Upper Chichester Twp.*, 504 F.3d 370, 392 (3d Cir. 2007) (requiring complaining wireless carriers to demonstrate that another carrier provides functionally equivalent services, and that the other carrier is similarly situated, i.e., that the structure, placement or cumulative impact of the existing facilities makes them as or more intrusive than the proposed facility); *Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 638-39 (2d Cir. 1999) (holding that the Act contemplates that *some* discrimination between providers is allowed so long as it is reasonable); *Virginia Beach*, 155 F.3d at 426-28 (finding that the Act contemplates some discrimination among providers but prohibits only unreasonable discrimination). Discrimination based on aesthetics and compatibility with the character of the area has been held reasonable. *Willoth*, 176 F.3d at 639; *Virginia Beach*, 155 F.3d at 427. Bell has not identified any other carrier to use as a comparator much less a functionally equivalent one. Nor has Bell demonstrated that it was treated less favorably nor that any differing treatment was unreasonable. Under any formulation of the statute, Bell's claim of unreasonable discrimination fails. The district court correctly entered judgment in favor of the Zoning Board and its members on this claim.

AFFIRMED.