# United States Court of Appeals
## For the First Circuit

No. 11-1706

GREEN MOUNTAIN REALTY CORP.,

Plaintiff, Appellant,

v.

JOHN S. LEONARD, Member and Chairman of Town of Milton Board of
Appeals; SARA L. HARNISH, Member of Town of Milton Board of
Appeals; VIRGINIA M. DONAHUE KING, Member of Town of Milton Board
of Appeals; BRIAN M. HURLEY, Member of Town of Milton Board of
Appeals; JEFFREY B. MULLAN, Member of Town of Milton Board of
Appeals; FRANCIS C. O'BRIEN, Member of Town of Milton Board of
Appeals; EMANUEL ALVES, Member of Town of Milton Board of
Appeals; STEVEN M. LUNDBOHM, Member of Town of Milton Board of
Appeals; TOWN OF MILTON, MASSACHUSETTS; MILTON CONSERVATION
COMMISSION; MILTON BOARD OF APPEALS,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Lynch, Chief Judge,
Stahl and Lipez, Circuit Judges.

David Ciandella, with whom Robert M. Derosier and
Donahue, Tucker & Ciandella, PLLC were on brief, for appellant.
Brandon H. Moss, with whom John P. Flynn and Murphy,
Hesse, Toomey & Lehane, LLP were on brief, for appellees.

August 9, 2012

**LIPEZ, Circuit Judge**. This appeal arises from an attempt by appellant Green Mountain Realty Corp. to secure permits and regulatory approval to construct a 140-foot cellular phone tower in Milton, Massachusetts. Green Mountain's applications to the Town of Milton Zoning Board of Appeals (the "Board" or "BOA") and the Milton Conservation Commission (the "Commission" or "MCC"), both necessary steps in the approval process, were denied. Green Mountain subsequently challenged those decisions in the United States District Court for the District of Massachusetts, naming the BOA, the MCC, and the BOA's individual members as defendants. It argued that the decisions of the BOA and the MCC were not supported by "substantial evidence," as required by the Telecommunications Act of 1996 ("TCA"), 47 U.S.C. § 332(c)(7)(B)(iii), and that the decisions also constituted an "effective prohibition" on the provision of wireless services in the area, also in violation of the TCA, id. § 332(c)(7)(B)(i)(II). Green Mountain also claimed that the BOA's action exceeded its authority and was arbitrary and capricious, violating Massachusetts state law. The district court granted summary judgment for the BOA and MCC, finding that the decisions of those bodies complied with governing law, and this appeal ensued.

We affirm the district court's decisions with regard to Green Mountain's substantial evidence claims against the BOA and MCC. Given the deference due to the decisions of a local

-3-

regulatory body under the substantial evidence rubric, we will not disturb the district court's decisions on these issues. However, the district court did not adequately address Green Mountain's evidence supporting its effective prohibition claim against the BOA and completely failed to address the effective prohibition claim against the MCC. These are not claims that we should decide in the first instance, dependent as they are on factual findings to be made by the district court. Accordingly, we vacate the district court's grant of summary judgment in favor of the BOA and MCC on Green Mountain's effective prohibition claims and remand for reconsideration of those claims.

I.

## A.  The Proposed Site

Green Mountain owns and manages personal wireless communications facilities ("PWCFs"), commonly known as cellular phone towers, as well as other tower facilities. Green Mountain leases space on PWCFs to federally licensed providers of wireless telecommunications services ("carriers"), who mount antennae on the PWCFs to service their cellular networks.

On October 20, 2008, Green Mountain entered into an agreement with an agency of the Commonwealth of Massachusetts to lease land located adjacent to Interstate 93 ("I-93") in Milton, Massachusetts. The land is an unzoned triangular section, totaling approximately 2,700 square feet, formed by the intersection of I-93

and the Exit 3 southbound on-ramp leading to I-93 (the "Site"). The Site is in close proximity to Blue Hills Reservation, a Massachusetts state park, and the Carisbrooke Road residential neighborhood. The purpose of the lease was to enable Green Mountain to construct a PWCF on the site, and Green Mountain obtained letters of intent from two carriers, T-Mobile and metroPCS, stating their intention to locate antennae on the proposed tower. The Site was chosen because it is located within an area of degraded service for certain carriers, including T-Mobile and metroPCS. According to Green Mountain, the section of I-93 near the Site "has consistently suffered from a lack of adequate telecommunications coverage resulting in dropped calls, a possibility of being unable to complete emergency calls and an inconvenience to the traveling public."

Before Green Mountain could begin construction, it had to obtain regulatory approval from the BOA and MCC.

**B.   The BOA Proceeding**

The Zoning Bylaws of the Town of Milton ("Bylaws") include a subsection "regulat[ing] the siting, construction and removal of wireless telecommunications facilities so as to promote the safety, welfare and aesthetic interests of the Town of Milton." Bylaws § III(G)(1). Pursuant to the Bylaws, a special permit must be issued by the Board prior to construction of a PWCF or other telecommunications facility. Id. § III(G)(3)(c). To obtain a

-5-

special permit, one must submit a detailed application to the Board, participate in a public hearing on the application, pay any fees assessed by the Board to fund review by independent consultants chosen by the Board, as well as cooperate with those consultants in their review. The Board will issue a special permit only if three conditions are met: "(1) existing facilities do not adequately address the need for service, (2) there exists no feasible alternative to the proposal that would adequately address the need in a less intrusive manner, and (3) the proposed use is in harmony with the general purpose and intent" of the Bylaws to promote the Town's "safety, welfare and aesthetic interests." Id. § III(G)(4)(d), (G)(1).

In accordance with these requirements, Green Mountain submitted an application to the Board on May 21, 2009, seeking a special permit for construction of a 140-foot monopole tower on the Site. The application noted:

> The proposed facility will consist of a 140' monopole designed to accommodate up to five (5) antenna mounts for wireless carriers as well as Mass Highway Department video equipment . . . . An eight foot high chain link fence will be installed around the tower base for security purposes to comply with Mass Highway requirements to minimize visual obstructions for merging traffic.

The plan also included space for ground equipment to service the monopole and antennae. According to Green Mountain, "radio frequency analysis provided to us by our prospective tenants has

-6-

indicated that 100' would be the lowest mounting height that effectively fills the current coverage gap." Because "carriers' [antennae] must be separated from each other's installation by approximately 10'," the tower must be at least 140 feet to accommodate five different carriers.[1]

Along with its application, Green Mountain submitted statements from metroPCS and T-Mobile indicating the existence of a coverage gap and the need for the PWCF. Green Mountain also filed a statement that it had considered existing structures, as well as alternate sites, and concluded that a PWCF at the proposed Site was the only feasible option. It submitted numerous maps showing the coverage provided by various carriers. In response to suggestions from neighbors and other interested parties, Green Mountain considered five alternative sites, but rejected each as unworkable. It explained that the chosen Site was suitable because "[t]he subject property is non-residential in nature, has existing small towers in place, is located away from residential uses, and has reasonable vehicle access and availability of utilities."

Green Mountain also submitted a National Environmental Policy Act ("NEPA") Report that evaluated the tower's potential impact on environmental and historical areas. The NEPA Report,

---

[1] Green Mountain emphasizes that the Bylaws encourage the co-location of antennae on a single structure. See Bylaws § III(G)(1)(c).

-7-

which was prepared by consultants, did not find any significant impact on the environment or historical sites.

Both Green Mountain and those opposed to the PWCF project attempted to document how the tower would affect the landscape and views in the surrounding area, especially within the Blue Hills Reservation. Green Mountain raised a crane at the Site to the approximate height of the proposed tower and took pictures from various locations. It is undisputed that the tower would be visible from several areas within the Blue Hills Reservation, including from two of its highest hills. The tower would also be visible from the Carisbrooke Road neighborhood. Green Mountain reported that the proposed tower would not carry Federal Aviation Administration markings or lights, and it suggested methods to camouflage the tower to the extent possible.

At public hearings held on June 16, July 13, and August 19, 2009, there was almost unanimous public opposition to the proposed tower. While the BOA received one letter in support of the project, no interested citizen spoke in favor of the project and numerous people testified in opposition. Representatives of the Friends of the Blue Hills, a charitable trust formed to restore, preserve, and protect the Reservation, argued that the need for the tower did not outweigh the significant negative aesthetic effects. Several other concerned citizens spoke at the hearings, and the BOA received petitions signed by twenty-seven

-8-

Carisbrooke Road neighborhood residents expressing concerns about the tower's aesthetic impact on the Blue Hills Reservation and nearby neighborhoods.

On August 19, 2009, the BOA voted to deny Green Mountain's application for a special permit. In a written denial, issued on September 24, 2009, it emphasized the public opposition to the proposed tower and the importance of protecting the character and aesthetic beauty of the Blue Hills Reservation. The Board further noted that "[s]uch a monopole would also be visible to the Carisbrooke Road neighborhood in particular and would substantially detract from the character of the neighborhood." Additionally, the Board found that "[t]he existing coverage while not perfect is reasonable and adequate under all of the circumstances." In reaching this conclusion, the Board relied on the percentage of dropped calls mentioned by Green Mountain's attorney at a public hearing - approximately 0.66% - and not the figure provided by an engineer for one of the carriers, 2.00% - 3.00%.[2]

Ultimately, the Board found that Green Mountain "failed to carry its burden of proof for the issuance of a special permit" because it failed to show that the proposed tower "promote[s] the

---

[2] Green Mountain now says that the 0.66% figure provided by its attorney at the hearing was an error.

safety, welfare or aesthetic interests of the Town of Milton" and thus was "not in harmony with the [zoning] Bylaw."

## C.  The MCC Proceeding

The MCC is a local body charged with administering the Milton Wetlands Bylaws (distinct from the Zoning Bylaws), as well as the Massachusetts Wetlands Protection Act ("WPA"), Mass. Gen. Laws c. 131, § 40.[3]  The WPA provides, inter alia, that no person shall "alter . . . any riverfront area" without receiving authorization from the appropriate conservation commission or other body.  Id.  Under the terms of the WPA,

> [i]n the case of riverfront areas, no order issued by a conservation commission . . . shall permit any work unless the applicant, in addition to meeting the otherwise applicable requirements of this section, has proved by a preponderance of the evidence that (1) such work, including proposed mitigation measures, will have no significant adverse impact [on various environmental interests] . . . , and (2) there is no practicable and substantially equivalent economic alternative to the proposed project with less adverse effects . . . .

Id.  Pursuant to Massachusetts regulations, the MCC must presume that the affected riverfront area is significant to the various environmental interests identified by the WPA.  310 Mass. Code

---

[3] Appellees refer to both the "Wetlands Protection Act" and the "Rivers Protection Act" in their briefing.  The Rivers Protection Act was a 1996 amendment to the Wetlands Protection Act and, accordingly, both are codified at section 40 of chapter 131 of the Massachusetts General Laws.  For the purpose of this appeal, there is no practical distinction between the two.  For ease of reference, we here refer to section 40 as simply the WPA.

Regs. 10.58(3). However, "[t]he presumption is rebuttable and may be overcome by a clear showing that the riverfront area does not play a role in the protection of one or more of these interests." Id.

The WPA "establishes minimum Statewide standards leaving local communities free to adopt more stringent controls." T.D.J. Dev. Corp. v. Conservation Comm'n of N. Andover, 629 N.E.2d 328, 330 (Mass. App. Ct. 1994). "When a municipality adopts a by-law or ordinance that is consistent with the [WPA], but that imposes more stringent controls than the standards set by the Legislature, the local requirement trumps what is required under [the WPA]." Id. Milton has adopted wetlands bylaws supplementing the WPA. The application process laid out in those bylaws largely tracks that established by the WPA and charges the MCC with approving or denying applications and issuing permits for work covered by the bylaws and the WPA. Milton Wetlands Bylaws, ch. 15, § IIA. The Milton Wetlands Bylaws also create a "non-disturbance zone" extending 25 feet from the edge of the protected wetland. Id. § XI. Any activity altering the zone is prohibited without a vote of the majority of the MCC and a finding that "granting of such relief will not have a significant adverse impact upon the interests protected by [the bylaws]."[4] Id.

_____

[4] The interests protected by the Milton Wetlands Bylaws include "[protection of] public or private water supply; aquifer and groundwater protection; flood, erosion and sedimentation

-11-

Because of its proximity to the Blue Hills River, the Site was subject to the WPA and Milton Wetlands Bylaws and the specific provisions relating to riverfront areas. On February 12, 2009, Green Mountain submitted the requisite notice and request for approval, emphasizing that the Site was already degraded by the presence of I-93. It noted that while 4,612 square feet of riverfront area would be altered by the proposed project, only 92 square feet fell within 100 feet of the Blue Hills River; the remainder was not only more than 100 feet away from the river, but also separated from the river by the I-93 on-ramp, which is itself roughly 100 feet from the river. Green Mountain also pointed out that only 109 square feet of Bordering Vegetated Wetland ("BVW"), a category of protected land, would be affected by the project. It acknowledged that this area "will be unavoidably impacted." It emphasized, however, that "this BVW is already in a state of chronic impact due to its location between the highway and its on-ramp. Sand, salt, trash and untreated stormwater are repeatedly discharged to this wetland from the concrete surfaces directly adjacent to the proposed cell tower site." Green Mountain argued that because of proposed mitigation measures, its project would actually improve the degraded area.

---

control; storm damage and water pollution prevention; the protection of fisheries, shellfish and wildlife; recreation and aesthetics." Milton Wetlands Bylaws, ch. 15, § I.

Green Mountain's application was discussed at a series of MCC meetings. The minutes for a March 10, 2009 meeting state, "Applicant did not address Commission concerns: Aesthetics affecting Blue Hills, alternative analysis[] regarding site location and tower height efficiency ratings and failed to address the Town by Law [sic] regarding the 'no significant adverse impact' standard for justifying a waiver of the non-disturbance regulation." In several subsequent meetings, Green Mountain attempted to address these concerns. At the request of the MCC, Green Mountain submitted the NEPA Report it had previously submitted to the BOA. It also proposed a series of mitigation measures to limit the impact of the project and improve the area. The MCC also requested an alternative site analysis prepared by the Massachusetts Highway Department that Green Mountain referred to at an MCC meeting. Green Mountain has since acknowledged that this analysis did not exist in written form.

At the May 12, 2009 meeting of the MCC, Green Mountain requested that the hearing on its proposal be continued until after the BOA made a decision. After the BOA denied Green Mountain's application, the MCC met on September 15, 2009. The minutes of that meeting reflect the MCC's displeasure with Green Mountain's failure to respond to its requests for information. In particular, the Commission was concerned that Green Mountain failed to provide a meaningful analysis of potential alternative sites that the

-13-

developer had repeatedly referred to and the Commission had requested.

On September 19, 2009, the MCC voted to deny Green Mountain's request for relief from the non-disturbance zone established by the Milton Wetlands Bylaws, as well as its application under the WPA. In a brief written statement issued on October 9, 2009, the MCC explained that Green Mountain's failure to provide a meaningful alternatives analysis prevented it from approving the proposal. It noted that such an analysis, required by Massachusetts regulations, had been requested on multiple occasions. Additionally, the MCC emphasized the importance of the aesthetic interest it is charged with protecting. It stated that "the height of the tower was, and remains, an important factor for consideration. . . . Once again, the applicant failed to provide the requested data relating to the efficacy of a lower tower height, which data was requested on three occasions." Responding to Green Mountain's argument that the Site was already degraded, the MCC stated that "it is the opinion of the MCC that if those wetlands, which the applicant seeks to further alter, are already degraded, those wetlands are in greater need of protection, rather than less."

## D. The District Court Proceeding

Green Mountain challenged the decisions of the BOA and MCC in a single action in the United States District Court for the

-14-

District of Massachusetts, arguing that they violated multiple provisions of the TCA. "[T]he TCA reflects Congress's intent to expand wireless services and increase competition among . . . providers." Sw. Bell Mobile Sys., Inc. v. Todd, 244 F.3d 51, 57 (1st Cir. 2001). "Under the TCA, local governments retain control 'over decisions regarding the placement, construction, and modification of personal wireless service facilities.'" Id. (quoting 47 U.S.C. § 332(c)(7)(A)). However, "this control is now subject to several substantive and procedural limitations that 'subject [local governments] to an outer limit' upon their ability to regulate personal wireless services land use issues." Id. (alterations in original) (quoting Town of Amherst v. Omnipoint Commc'ns Enters., Inc., 173 F.3d 9, 15 (1st Cir. 1999)).

One of the primary limits on local authority is the requirement that "[a]ny decision . . . to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in the written record." 47 U.S.C. § 332(c)(7)(B)(iii). Another is the requirement that local decisions not "prohibit or have the effect of prohibiting the provision of personal wireless services." Id. § 332(c)(7)(B)(i)(II). Green Mountain argued both that the decisions of the BOA and the MCC were not supported by "substantial evidence," and that they also constituted an impermissible "effective prohibition" on the provision of wireless services in

-15-

the area.  Green Mountain also claimed that the BOA's action exceeded its authority and was arbitrary and capricious in violation of state law.

In evaluating an "effective prohibition" claim, "district courts are free to consider additional evidence" not in the administrative record.  <u>Second Generation Props., L.P.</u> v. <u>Town of Pelham</u>, 313 F.3d 620, 629 (1st Cir. 2002); <u>see</u> <u>also</u> <u>Nat'l Tower, LLC</u> v. <u>Plainville Zoning Bd. of Appeals</u>, 297 F.3d 14, 24 (1st Cir. 2002) ("On the 'effective prohibition' issue, district courts may take evidence beyond the record.").  Green Mountain offered additional evidence to the district court on its effective prohibition claim, beginning with extensive expert testimony to establish the existence of a coverage gap.  It also offered affidavits and deposition testimony from the president of Green Mountain, as well as from a consultant, describing why Green Mountain felt that there were no viable alternatives to the proposed site.  They noted that a suitable site requires appropriate topography, access for maintenance, utility connections, size, and availability.  Green Mountain also noted that it explored the possibility of using a network of smaller antennae, rather than a single large PWCF, but determined that this option was not feasible.

The district court granted summary judgment for the defendants on all of Green Mountain's claims.  First, the court

found that the BOA's decision was supported by substantial evidence.  Explaining this conclusion, it stated that Green Mountain failed to show that existing service was inadequate and that the BOA had sufficient justification to deny the permit because of aesthetic concerns.  Furthermore, it found that Green Mountain failed to adequately explore alternative sites.  Second, on the effective prohibition claim, the court found with scant discussion that Green Mountain failed to show that the standard applied by the BOA would be impossible for any applicant to meet, and that Green Mountain had not demonstrated that its proposal was the only feasible plan.  Finally, the court found that Green Mountain failed to meet its burden of showing that the MCC's conclusion that the project would have a significant adverse impact on surrounding wetlands was not supported by substantial evidence. The district court's written decision did not address Green Mountain's argument that the MCC's decision was an effective prohibition or Green Mountain's state law claim challenging the BOA's decision.

## II.

### A.  The Substantial Evidence Standard

In evaluating whether a decision is supported by substantial evidence, we review

> the written record considered as a whole.
> Substantial evidence is such relevant evidence
> as a reasonable mind might accept as adequate
> to support a conclusion.  The reviewing court

> must take into account contradictory evidence in the record. But the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.

Sw. Bell, 244 F.3d at 58 (quoting Penobscot Air Servs., Ltd. v. Fed. Aviation Admin., 164 F.3d 713, 718 (1st Cir. 1999)). Thus, "[t]he 'substantial evidence' standard of review is the same as that traditionally applicable to a review of an administrative agency's findings of fact . . . [, and] [j]udicial review under this standard, even at the summary judgment stage is narrow." Id. (citation omitted) (internal quotation marks omitted).

Despite this limited oversight, we have cautioned that "substantial evidence review is not a rubber stamp." Penobscot Air, 164 F.3d at 718 n.2. A local regulatory agency or other body "is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." Sw. Bell, 244 F.3d at 59 (internal quotation marks omitted). Accordingly, decisions "must be set aside when the record before a Court of Appeals clearly precludes the agency's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." Penobscot Air, 164 F.3d at 718 (alterations omitted). Ultimately, the burden of demonstrating that the determination of a local authority is not supported by substantial evidence is with the party seeking

-18-

approval, Sw. Bell, 244 F.3d at 63, and "courts defer to the decision of the local authority, provided that the local board picks between reasonable inferences from the record before it," Nat'l Tower, 297 F.3d at 23.

Because the focus of our review is the administrative record, "we . . . apply the same legal standards that pertain in the district court and afford no special deference to that court's decision." Sw. Bell, 244 F.3d at 59 (internal quotation marks omitted). Therefore, we consider the decision of the district court only to the extent that it is persuasive.

## B. The BOA's Decision: Substantial Evidence

As described above, pursuant to the Milton Zoning Bylaws, the BOA may issue a special permit only if three conditions are met: "(1) existing facilities do not adequately address the need for service, (2) there exists no feasible alternative to the proposal that would adequately address the need in a less intrusive manner, and (3) the proposed use is in harmony with the general purpose and intent" of the bylaws. Bylaws § III(G)(4)(d). Accordingly, a decision to deny issuance of a permit must be affirmed if there is substantial evidence supporting the Board's finding that any one of these three factors is not present. In this case, the Board's written decision addresses only two of the three factors - the adequacy of existing cellular coverage and the proposal's consistency with the purpose and intent of the bylaws.

-19-

### 1. The Adequacy of Existing Coverage

The BOA justifies its finding that the existing cellular coverage is adequate by pointing to the statement of Green Mountain's attorney that approximately 2,000 of 300,000 calls are dropped in the coverage area. In particular, the BOA states that

> [w]hile there is a small dead spot in the area between Route 24 in Milton and Route 138 in Canton, the dropping of any 2,000 of 300,000 or [0.66%] of calls is a marginal loss of service when compared to the dramatic intrusion of the 140 foot monopole on the Reservation and near[b]y neighborhood. The existing coverage while not perfect is reasonable and adequate under all of the circumstances.

Green Mountain argues here that the 0.66% figure was simply a misstatement by its attorney at a Board meeting, and that it was error for the Board to rely exclusively on this figure when it also presented testimony from engineers that the actual dropped call rate was much higher. It points to testimony of a T-Mobile engineer, estimating that the figure was actually 2-3%, as well as an affidavit submitted by the same engineer, stating that if the permit were denied "a significant area of inadequate, unreliable coverage would remain in T-Mobile's wireless network. This lack of service area or 'gap' in coverage would adversely impact . . . [T-Mobile's ability] to provide . . . decent coverage to traffic on I-93 between SR-138 and SR-24." Similarly, Green Mountain submitted an affidavit from an engineer employed by metroPCS stating that "Milton is an area where metroPCS has identified a need to locate

-20-

a [PWCF]. A [PWCF] in this vicinity is necessary to provide coverage in the area and resolve a significant gap in metroPCS' wireless network."

In these circumstances, we cannot conclude that the BOA's finding regarding the adequacy of existing coverage was supported by substantial evidence. It was clearly erroneous for the BOA to adopt the dropped call figure mentioned by Green Mountain's attorney - 0.66% - when Green Mountain presented evidence in the form of written statements and testimony from engineers employed by the carriers stating that a more significant coverage gap existed. See Sw. Bell, 244 F.3d at 59 (stating that a local regulatory agency "is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands" (quoting Penobscot Air, 164 F.3d at 718) (internal quotation marks omitted)).

Disregarding the oral testimony of T-Mobile's engineer, the district court accurately noted that neither of the statements submitted by the engineers provided quantifiable data identifying a coverage gap. However, we have never required that the percentage of calls dropped, or signal strength, cross a certain threshold before recognizing a significant gap. See Omnipoint Holdings, Inc. v. City of Cranston, 586 F.3d 38, 49 (1st Cir. 2009) (stating that "[a]lso relevant could be data about percentages of unsuccessful calls or inadequate service during calls in the gap

area," but refusing to adopt a "bright-line" rule with regard to signal strength (emphasis added)); see also MetroPCS, Inc. v. City and Cnty. of San Francisco, 400 F.3d 715, 733 (9th Cir. 2005) ("'[S]ignificant gap' determinations are extremely fact-specific inquiries that defy any bright-line legal rule."). Accordingly, while certainly valuable, such data is not essential.

Additional evidence identifying a coverage gap, including data, was presented to the district court in connection with Green Mountain's "effective prohibition" claim. However, in evaluating a "substantial evidence" claim, we are limited to the evidence in the record before the local body. See Sw. Bell, 244 F.3d at 58. Accordingly, we do not consider this additional evidence in reviewing the BOA's decision under the substantial evidence standard.

In the absence of any evidence to the contrary, statements from two different carriers identifying a coverage gap, as well as oral testimony indicating that 2-3% of calls in the area are dropped, is substantial evidence that existing facilities do not adequately address the need for service. Presented with this evidence, the Board, in its written decision, cherry-picked a single, non-testimonial statement by Green Mountain's attorney and ignored the other evidence in the record.[5] This the Board may not

---

[5] The context for the attorney's statement is not clear from the record. However, Green Mountain asserts that the statement was non-testimonial and appellees do not contest this assertion.

do.  See Sw. Bell, 244 F.3d at 58 ("The reviewing court must take into account contradictory evidence in the record.").  Keeping in mind that we must review the record as a whole, id., the Board's decision, relying solely on an attorney's statement, is not based on substantial evidence.  That is, taking into account the evidence to the contrary, it is not "adequate to support [the Board's] conclusion."  Id.

Thus, we must consider whether the other rationale relied upon by the Board supports its denial of the permit.

### 2. The Proposal's Harmony With the Purpose and Intent of the Bylaws

The subsection of the Milton Zoning Bylaws governing wireless telecommunications facilities states that its purpose is to "regulate the siting, construction and removal of wireless telecommunications facilities so as to promote the safety, welfare and aesthetic interests of the Town of Milton."  Bylaws § III(G)(1).  To further this purpose, the provision states an intent to "[d]iscourage the construction or location of free-standing towers," id. § III(G)(1)(e), and to "[m]aintain and preserve the residential character of the Town of Milton by eliminating or minimizing the adverse visual and aesthetic impact of all wireless telecommunications facilities," id. § III(G)(1)(f).

The Board's written decision focuses on this aesthetic interest in denying Green Mountain's application for a special permit.  It states:

> [T]he construction of a 140'
> telecommunications monopole at the proposed
> location will be widely visible from the
> Reservation and will substantially detract
> from the view, vistas and natural setting of
> the Reservation. Such a monopole would also
> be visible to the Carisbrooke Road
> neighborhood in particular and would
> substantially detract from the character of
> the neighborhood. . . . [It] will effectively
> deprive [Carisbrooke Road] residents of one of
> the primary reasons they moved to this area.

In addition, the Board noted the public opposition to the project and observed that the objections were not merely "a small number of generalized comments of concern or 'not in my backyard' complaints but rather constitute[] virtual unanimous concern of a thoughtful community to the unsightly intrusion of a 140' monopole upon their existing views and vistas of the Reservation from their residences and from the neighborhood generally."[6] The Board took special note of the objections raised by the Friends of the Blue Hills, noting that "[t]he informed opposition of the Friends to the proposed monopole is interposed, in good faith, based upon over 44 years of experience in protecting and preserving this historic Reservation." Ultimately, the Board found that "[t]he proposed monopole does not promote the safety, welfare or aesthetic interests of the Town of Milton as required by the Wireless Telecommunications Facilities

---

[6] Several of the residents' complaints also referred to purported health concerns from negative environmental effects. However, these concerns are an impermissible ground on which to deny Green Mountain's application. See 47 U.S.C. § 332(c)(7)(B)(iv); Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 494-95 (2d Cir. 1999).

Bylaw," and thus that Green Mountain's application "is not in harmony with the general purpose and intent of the Bylaw."

The question of whether there is sufficient evidence in the record to support the Board's "aesthetic interests" justification is close. A number of courts, including this one, have recognized that cell towers are inherently aesthetically displeasing. See Sw. Bell, 244 F.3d at 61; VoiceStream Minneapolis, Inc. v. St. Croix County, 342 F.3d 818, 831 (7th Cir. 2003) ("[B]ecause 'few people would argue that telecommunications towers are aesthetically pleasing,' a local zoning board's 'aesthetic judgment must be grounded in the specifics of the case.'" (quoting Sw. Bell, 244 F.3d at 61)). As said in Helcher v. Dearborn County, 595 F.3d 710, 723 (7th Cir. 2010), "[a]lthough local governments are entitled to weigh the aesthetic effect of a wireless tower in deciding whether to permit its construction, generalized aesthetic concerns are not alone sufficient to justify the denial of a permit." Rather, an "aesthetic judgment must be grounded in the specifics of the case."[7] Id.

---

[7] Other circuits have taken a similar approach in reviewing the decisions of regulatory boards that were required to consider the aesthetic impact of PWCFs. See, e.g., Sprint Spectrum, L.P. v. Platte Co., 578 F.3d 727, 733 (8th Cir. 2009) ("[A]esthetic concerns can be a valid basis on which to deny [a provider's] permit, so long as the aesthetic judgment is grounded in the specifics of the case and not based on generalized aesthetic concerns that are applicable to any tower, regardless of location." (internal quotation marks omitted)); Cellular Tel., 166 F.3d at 495-96 (stating that while aesthetics could be a valid ground for denial of a permit under the TCA, a "few generalized expressions of

In Southwestern Bell, we explained that, under the TCA, local boards retain their "traditional prerogative to restrict and control development based upon aesthetic considerations, so long as those judgments do not mask, for example, a de facto prohibition of personal wireless services." Id. at 61. Furthermore, we noted that, "[i]n assessing the visual impact of the proposed tower, the Board was entitled to make an aesthetic judgment about whether that impact was minimal, without justifying that judgment by reference to an economic or other quantifiable impact." Id. However, in order to ensure that aesthetic considerations were not used as a pretext to prohibit all tower-like structures, we cautioned that "generalized aesthetic concerns . . . applicable to any tower, regardless of location" would not suffice. Id. (citing Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 495 (2d Cir. 1999)). Similarly, we noted that objections from local residents or zoning boards that reflect a misunderstanding as to the tower or the site, or that are contrary to the objective evidence, cannot be the basis for a denial. Id. (listing cases).

Here, the Board cited in support of its denial on aesthetic grounds a petition signed by 27 neighborhood residents. If the decision rested on those stated complaints alone we would be given pause. Such reliance presents a risk that the accomplishment of the Congressional goals in the TCA could, contrary to Congress's

concern with 'aesthetics' cannot serve as substantial evidence").

-26-

intent, be defeated by the "generalized aesthetic concerns" of local constituents. Members of local boards are likely "to find the opinions of angry constituents compelling." Primeco Personal Commc'ns, L.P. v. Village of Fox Lake, 26 F. Supp. 2d 1052, 1063 (N.D. Ill. 1998) (cited in Oyster Bay, 166 F.3d at 496).

Local decisions on aesthetic grounds are more often affirmed when there is objective evidence to support the conclusions, such as photographs, site plans, surveys, and the like. The Board's decision here rests on such objective evidence. The Board saw plans indicating that, although there are some existing utility poles on the site, the proposed tower, at 140 feet, would be more visible than everything already in place. In making its decision, the Board also relied on photographs of the crane tests conducted by Green Mountain and residents' testimony about those tests to measure the visual impact of the proposed tower.[8] Additionally, the Board received statements from the Friends of the Blue Hills describing the effect of the tower on

---

[8] Green Mountain conducted two crane tests at the Site approximately four months apart. Although the record is not clear, it appears that during the latter test, the crane was raised to a height of 160 feet because one of the camouflaging options considered by Green Mountain would require a tower at this height. This option would have involved mounting antennae inside the monopole rather than on its exterior. However, in its application to the BOA, Green Mountain stated that the first test was at a height of 140 feet and it submitted photos of this test along with its application. The photos from the 140-foot test show that the crane could be seen above the tree line from multiple vantage points.

views from that historic state park, providing some limited support. The parties dispute how widely visible the proposed tower would be from within the Reservation. However, the evidence before the Board indicated that the tower would be visible from at least four different locations within the 8,000-acre Reservation.[9]

In aggregate, this evidence is sufficiently grounded in the specifics of the case to satisfy the substantial evidence standard. See Helcher, 595 F.3d at 724 ("The photographic representations of the tower as viewed from the property of . . . neighbors, accompanied by the objections of many residents who purchased land and built homes in this area specifically because of the natural views, provided the Zoning Board with substantial evidence to reject the permit."); Sprint PCS Assets, L.L.C. v. City of Palos Verdes Estates, 583 F.3d 716, 726 (9th Cir. 2009) (finding substantial evidence supporting denial of permit where the city council reviewed "mock-ups of the proposed [P]WCFs and a report that detailed the aesthetic values at stake," as well as public comments, and concluded that the tower would "detract from the residential character of the neighborhood"); VoiceStream

---

[9] The Board's decision also states that the Blue Hills Reservation is designated a Massachusetts historic district and is listed in the National Registry of Historic Districts. As an alternate ground for denial of Green Mountain's application, it notes that the Bylaws forbid freestanding PWCFs within such districts. However, the proposed site is not within the Blue Hills Reservation, but adjacent to it. This conclusion was therefore in error.

<u>Minneapolis</u>, 342 F.3d 818, 832 (finding substantial evidence where decision was based on "an on site investigation, and a map . . . document[ing] that the 185-foot tower would be visible for several miles along [a scenic] [r]iverway," as well as testimony from "Park Service representatives, local residents and various state and local entities" documenting how the tower would interfere with the unique scenery on the riverway).

Put another way, the evidence before the Board was "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion" that the proposed tower was not consistent with the purpose and intent of the bylaws. <u>Sw. Bell</u>, 244 F.3d at 58. Green Mountain has not carried its burden of demonstrating that the Board's decision is not supported by substantial evidence.[10] <u>See</u> <u>id.</u> at 62.

---

[10] Green Mountain linked its Massachusetts state law claim to its substantial evidence claim against the BOA. In its entirety, its argument to the district court on its state law claim states that "[f]or all the reasons stated above in regards to the absence of substantial evidence supporting the Board's denial, the Board's denial was not based upon evidence and was therefore unreasonable, arbitrary and capricious in violation of M.G.L. Chapter 40a, Section 17." Green Mountain's argument in its briefing to us is a similarly conclusory assertion of the same point. Although the district court did not address the state law claim directly, we assume that in finding the Board's decision to be supported by substantial evidence the court also found that it was not arbitrary or capricious in violation of Massachusetts law. We do likewise.

## C.   The MCC's Decision: Substantial Evidence

As noted, pursuant to the WPA, Green Mountain must show that its proposal would "have no significant adverse impact on the riverfront area" with regard to the various environmental interests protected by the act.   Mass. Gen. Laws ch. 131, § 40. Additionally, Green Mountain must show that "there is no practicable and substantially equivalent economic alternative to the proposed project with less adverse effects."   Id. Massachusetts regulations create a presumption that a riverfront area, such as that at issue here, is significant to the interests protected by the WPA.   310 Mass. Code Regs. § 10.58(3).   This presumption may be overcome only by "a clear showing that the riverfront area does not play a role in the protection of one or more of these interests."   Id.

In this case, the MCC's written decision explained that: 1) the fact that the site was already degraded by the presence of I-93 did not by itself mean that Green Mountain's project would have no adverse effect; 2) Green Mountain had not provided a requisite alternatives analysis demonstrating that there were no less harmful alternatives to its proposal; and 3) the proposed tower would negatively affect the aesthetics of the area.

On appeal, Green Mountain argues that the MCC's decision is not supported by substantial evidence.   It relies on a letter submitted to the MCC by its environmental consultant, Alec MacLeod,

on March 19, 2009, asserting that its proposal will not adversely affect the interests protected by the Bylaws and the WPA.  This letter states:

- The proposed project is located toward the narrow end of a triangle created by an on-ramp and the south-bound lanes of Route 93.

- In this highly energetic and chronically disturbed location, it can be reasonably assumed that wildlife and fisheries habitat will not be a concern.

- Given the site's disconnection from the surrounding natural hydrology, it is also reasonable to conclude that the project will have no significant effect on public or private water supply.

- Given the overwhelming stormwater effects created by the adjacent highway, and given that the only new impervious surfaces are the actual mechanicals supporting the tower and the 8 x 8 foot tower foundation, there should be no significant effect on storm damage or water pollution.

- Sediment and erosion control will be accomplished by installation of a sediment and erosion control barrier and by virtue of the fact that the access surfaces will be gravel, not pavement.

- No recreation can take place within or near the proposed area.

This letter, and specifically this bullet-point list, is the sum of the evidence on which Green Mountain relies in its briefing.

These statements, however, do not undermine the MCC's conclusion. As the Commission points out in its brief, MacLeod also reported that "any flows entering the site from the surrounding highway surfaces slowly percolate[] outward through the sandy substrate, contributing to the Blue Hill River via groundwater flow." Thus, the Commission found, any further construction on the site, however slight, will adversely affect the wetlands area. Furthermore, it notes that Green Mountain's application acknowledges that "[d]ue to the necessary location of the cell tower compound and . . . minimization of resource area impacts, 109 square feet of [bordering vegetated wetland] will be unavoidably impacted." The application concedes that there is no cost-effective way to replicate this lost area.

Although the degraded condition of the site sets the baseline against which the adverse impact of Green Mountain's proposal is measured, it is not dispositive. Even if the site is already degraded, the WPA and Milton Wetlands Bylaws require that the project have no further adverse impact.[11] See Mass. Gen. Laws ch. 131, § 40. The sum of Green Mountain's evidence as to this impact was MacLeod's conclusory statements in his letter. Given that Green Mountain had the burden of establishing no adverse

_____

[11] Of course, the MCC was not entitled to insist that Green Mountain improve the condition of the Site. Although Green Mountain argued that its proposal may improve the Site, there is no indication that the MCC imposed this requirement.

impact, and given that the Commission found that it had not sustained that burden, we may only find for Green Mountain if we conclude that their evidence compelled a contrary conclusion. See Nat'l Tower, 297 F.3d at 23 ("[C]ourts defer to the decision of the local authority, provided that the local board picks between reasonable inferences from the record before it."). For the reasons identified by the MCC, Green Mountain's evidence is not so compelling.

Furthermore, there was substantial evidence supporting the Commission's conclusion that Green Mountain failed to carry its burden of proving by a preponderance of the evidence that "there is no practicable and substantially equivalent economic alternative to the proposed project with less adverse effects." Mass. Gen. Laws ch. 131, § 40. Although Green Mountain provided a document that it styled an "alternative siting analysis," the MCC explained its inadequacy. The minutes of the MCC's September 15, 2009 meeting state: "[Green Mountain] submitted a map, which purports to be an 'alternative site analysis' proposed by the applicant . . . . The site analysis is limited to the entrance ramp and exit ramp at the same locale, rather than an area wide assessment. The applicant did not provide a tower height efficiency analysis." It was reasonable for the Commission to conclude that this single-page document, which failed to evaluate any locations outside of the immediate vicinity of the proposed Site or any alternative tower

designs and/or heights, did not carry the applicant's burden of showing that there were no alternatives to its proposal.

The MCC also noted that Green Mountain failed to provide an alternatives analysis conducted by the Mass. Highway Dept. The written explanation of the MCC's decision states that despite its repeated requests for this alternatives analysis, which was purported to evaluate both alternative locations and different tower heights, "[t]o date, the applicant has failed, neglected or refused to provide the data which was requested." The MCC goes on to note, "At a scheduled hearing date, on September 15, 2009, the representative of the applicant acknowledged that Mass Highway indicated that the analysis had been done, but he did not think it actually existed [in written form]."

This sequence of events supports the MCC's conclusion as to the inadequacy of Green Mountain's attempts to show a lack of alternatives. Over the course of five months and three Commission meetings, Green Mountain referred to the Mass. Highway Dept. study as proof of a lack of alternatives and agreed to provide it to the MCC. It was not until after the BOA had rejected Green Mountain's application that Green Mountain acknowledged that the study did not exist in written form, offering no other documentation of the study. Accordingly, the only evidence before the Commission on the issue of alternatives was Green Mountain's map of the I-93 exit 3 location, which evaluated only a fraction of the relevant area and

provided no information regarding alternative heights or designs.[12]

Given Green Mountain's lack of evidence as to less impactful

alternatives -- an important burden imposed on the developer by the

governing law -- the MCC was entitled to conclude that the

developer had failed to carry its burden.  See Mass. Gen. Laws ch.

131, § 40.

## III.

### A.  The Effective Prohibition Standard

We have explained that the effective prohibition standard

"can be violated even if substantial evidence exists to support the

denial of an individual permit under the terms of the town's

ordinances."  Nat'l Tower, 297 F.3d at 20.  "When a carrier claims

an individual denial is an effective prohibition, virtually all

circuits require courts to (1) find a 'significant gap' in coverage

exists in an area and (2) consider whether alternatives to the

carrier's proposed solution to that gap mean that there is no

effective prohibition."[13]  Omnipoint Holdings, 586 F.3d at 48.

---

[12] Green Mountain provided slightly more evidence on the issue
of alternatives to the BOA, in the form of coverage maps showing
the effect of a tower at the alternate locations proposed by local
residents.  However, the record does not reflect that this evidence
was ever presented to the MCC.

[13] Of course, Green Mountain is not a carrier, but a developer
leasing the land on which it hopes to build a PWCF.  However, "[a]
landowner tower developer is in no better position than a carrier
and has an equally heavy burden."  Second Generation, 313 F.3d at
629.  In fact, "[t]he landowner who wishes to build a tower on its
site is a unique plaintiff.  A landowner does not have an incentive
to identify possible sites on land it does not own."  Id. at 629

Therefore, while "an individual denial is not automatically a forbidden prohibition . . . [,] we [cannot] rule out the possibility that - based on language or circumstances - some individual decisions could be shown to reflect, or represent, an effective prohibition on personal wireless service."  Town of Amherst, 173 F.3d at 14.

 With regard to the first prong of this test, a significant gap must be "large enough in terms of physical size and number of users affected" to distinguish it from "a mere, and statutorily permissible, dead spot."  Second Generation, 313 F.3d at 631.  Indeed, "[f]ederal regulations contemplate that areas enjoying adequate coverage will still include spots without reliable service."  Id. (citing 360° Commc'ns Co. v. Bd. of Supervisors of Albemarle Cnty., 211 F.3d 79, 87 (4th Cir. 2000)).  Dead spots are defined as "[s]mall areas within a service area where the field strength is lower than the minimum level for reliable service," 47 C.F.R. § 22.99, and the presence of dead spots does not mean that service is per se inadequate, see id. § 22.911(b).

 Additionally, we have held that the provision of coverage by one carrier in a certain area does not insulate a regulatory decision denying other carriers the ability to provide service in the same area from a claim of effective prohibition.  Second

n.7.  The same is true of a lessee.

-36-

Generation, 313 F.3d at 633-34. Alternatively stated, "[t]he fact that some carrier provides some service to some consumers does not in itself mean that the town has not effectively prohibited services to other consumers." Id. at 634.

Evaluating the second prong of the effective prohibition test, we have "identified two sets of circumstances where there is a prohibition 'in effect.'" Id. at 630. "The first is where the town sets or administers criteria which are impossible for any applicant to meet. . . . The second involves the situation where the plaintiff's existing application is the only feasible plan; in that case, denial of the plaintiff's application 'might amount to prohibiting personal wireless service.'" Id. (quoting Town of Amherst, 173 F.3d at 14). These two examples do not, however, represent the only ways to demonstrate an impermissible prohibition on wireless services. "[T]here can be no general rule classifying what is an effective prohibition. It is a case-by-case determination." Id. In order to demonstrate an effective prohibition, the plaintiff must "show from language or circumstances not just that this application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." Town of Amherst, 173 F.3d at 14.

An effective prohibition claim "present[s] questions that a federal district court determines in the first instance without

any deference to the [local regulatory authority]." Nat'l Tower, 297 F.3d at 22. Thus, in evaluating an effective prohibition claim, unlike in our review of a substantial evidence challenge, we review the district court's opinion, not that of the Board, see Omnipoint Holdings, 586 F.3d at 47, and in determining whether an effective prohibition exists, a district court may rely on "evidence . . . presented in court that is outside of the administrative record compiled by the local authority," Nat'l Tower, 297 F.3d at 22. Therefore, "[i]f the district court makes evidentiary findings . . . that go beyond the administrative record, . . . we will review its factual findings for clear error and its legal conclusions de novo." Id.

**B.  The District Court's Effective Prohibition Analysis**

As described, the effective prohibition analysis is a two-part test, asking first whether there is a gap in coverage and, second, whether the absence of feasible alternatives to the proposed tower means that denial of an application effectively prohibits all wireless service in the area. Omnipoint Holdings, 586 F.3d at 48. The parties disagree as to whether a coverage gap exists. In evaluating the effective prohibition claim against the Board, the district court assumed that such a gap existed, focusing its analysis on the second prong of the test. It held that, regardless of the outcome of the coverage issue, Green Mountain had not met its burden of demonstrating that there are no feasible

alternatives or that the town's Bylaws are impossible for any applicant to meet.[14] <u>Green Mountain Realty Corp.</u> v. <u>Leonard</u>, No. 09-11559, 2011 WL 1898239, at *4 (D. Mass. May 18, 2011). With regard to the effective prohibition claim against the MCC, the court's written decision makes no findings and states no conclusion.

In explaining its decision on the effective prohibition claim against the Board, the court noted that the Board had approved other permit applications in the past and referred to the Board's conclusory statement that the alternative sites identified

---

[14] Green Mountain asserts that, because the Board did not address the issue of alternatives in its written decision, it was not entitled to raise the issue in defending the effective prohibition claim before the district court, and that the district court erred in considering the issue. This argument fails because "[t]he TCA does not itself expressly authorize local zoning boards to consider whether individual decisions amount to an 'effective prohibition.'" <u>Second Generation</u>, 313 F.3d at 630. Thus, a local entity's defense of an effective prohibition claim cannot be limited to the reasons given in its written decision. It makes sense to restrict a local entity's defense of a substantial evidence claim to the rationale provided in its written decision, for such a claim challenges the reasoning of that decision. <u>See</u> <u>Nat'l Tower</u>, 297 F.3d at 20-21. In contrast, an effective prohibition claim asserts that the decision, even if supported by the evidence, has an impermissible effect, and thus the district court considers the question de novo, taking, if it chooses, additional evidence not in the administrative record. <u>See</u> <u>Second Generation</u>, 313 F.3d at 629. Green Mountain points to our <u>National Tower</u> decision as an example of a case in which a local zoning board was barred from arguing that feasible alternatives existed. However, in that case, the local zoning board did not deny the permit on the grounds that feasible alternatives were available. The record showed that a remand for consideration of this issue would be inappropriate given the board's unwillingness to grant a permit under any circumstances. 297 F.3d at 23-24.

by local residents to the Board may have been feasible alternatives. However, the court did not address the additional evidence provided by Green Mountain demonstrating its attempts to identify and evaluate alternative sites.

The burden here is on Green Mountain. As we have explained, "[f]or a telecommunications provider to argue that a permit denial is impermissible because there are no alternative sites, it must develop a record demonstrating that it has made a full effort to evaluate the other available alternatives and that the alternatives are not feasible to serve its customers." Sw. Bell, 244 F.3d at 63; see also Omnipoint Holdings, 586 F.3d at 52 ("The burden is on the carrier to prove it investigated thoroughly the possibility of other viable alternatives before concluding no other feasible plan was available." (internal quotation marks omitted)). In this case, however, the district court did not acknowledge Green Mountain's attempt to carry its burden or the additional evidence it submitted.

In particular, Green Mountain submitted affidavits before the district court from its own president, as well as from the owner and manager of an independent consulting company hired to aid Green Mountain in the permitting process. These affidavits described efforts to identify alternative sites and explained why the sites suggested by local residents were unacceptable. The latter affidavit explained:

> [The consulting company] evaluated other
> potential alternatives and alternative sites
> within the coverage gap. The other potential
> alternatives were either unavailable, were not
> technically feasible or required greater
> zoning relief than the proposed Site and were
> deemed inferior to the chosen site. Nearly
> all of the land in Milton in the coverage gap
> is unsuitable to construct a PWCF due to the
> presence of zoning or conservation
> restrictions, wetlands, steep slopes, and/or
> no-curb cut areas.

Similarly, the affidavit from Green Mountain's president stated that he explored the possibility of locating a tower or antennae on an existing structure or constructing a network of dispersed antennae, but ultimately decided that neither option was viable. His affidavit also described efforts to locate alternative sites and the evaluation of the local residents' proposed sites. Supplementing these affidavits, Green Mountain also submitted deposition testimony from both its president and the consultant describing efforts to locate and evaluate alternative sites.

In addition, Green Mountain submitted a newly prepared report from an independent engineering firm, hired to evaluate alternative locations "in the vicinity of the interchange for the proposed cell tower." While this report did not evaluate sites outside of the immediate area around Exit 3 in Milton, it did conclude that Green Mountain's preferred site is "best suited for the tower installation, and likely the only location that [the Massachusetts Department of Transportation] will approve." Finally, Green Mountain submitted statements, deposition testimony,

and coverage maps from engineers working for T-Mobile and metroPCS. This evidence tended to show that a coverage gap existed within the networks of each of these carriers.

We express no opinion as to whether this evidence is sufficient to carry Green Mountain's burden of establishing that there were no feasible alternatives to its proposal and that the Board's decision thus constituted an effective prohibition. Not surprisingly, the appellees argue, as they did before the district court, that the reasons given by Green Mountain for rejecting the alternate sites identified by local residents were inadequate. Green Mountain is correct that the district court should have made written findings resolving these factual disputes and evaluating the evidence offered by the BOA. Likewise, the court should have addressed the effective prohibition claim against the MCC in a similar fashion.[15]

Unlike the substantial evidence analysis, an effective prohibition claim "present[s] questions that a federal district court determines in the first instance without any deference to the

---

[15] Green Mountain was subject to the permitting requirements of both the BOA and MCC, and either agency's decision could have independently been an effective prohibition. The existence of an effective prohibition may turn on the rationale for the denial of an application or the specific criteria relied upon by the administrative body. To say that there is a feasible alternative under one set of regulatory standards does not mean that there are also alternatives under differing standards. The effective prohibition analyses with respect to the BOA and MCC may be largely, or even entirely, overlapping, but if that was the case the court should have explained why that was so.

[local regulatory authority]," <u>Nat'l Tower</u>, 297 F.3d at 22, and a district court may rely on "evidence . . . presented in court that is outside of the administrative record compiled by the local authority," <u>id.</u> Here, the court failed to consider the evidence submitted by Green Mountain documenting its attempts to locate and evaluate alternative sites. Additionally, the court did not address Green Mountain's effective prohibition challenge to the MCC's decision. Accordingly, we must remand to the district court for reconsideration of the effective prohibition claims against the BOA and MCC. We leave it to the discretion of the district court whether to evaluate the claims on the current record or allow the parties to submit additional evidence.

## IV.

For the foregoing reasons, we <u>affirm</u> the district court's decisions with regard to Green Mountain's substantial evidence claims against the BOA and MCC. However, we <u>vacate</u> the district court's grant of summary judgment in favor of the BOA and MCC on Green Mountain's effective prohibition claims, and remand the case to the district court for consideration of these claims. Each party shall bear their own costs.

So <u>ordered</u>.