[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-10487

_____

D.C. Docket No. 1:10-cv-01638-RWS

T-MOBILE SOUTH, LLC,

Plaintiff - Appellee,

versus

CITY OF MILTON, GEORGIA,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(September 5, 2013)

Before CARNES, Chief Judge, DUBINA and GILMAN,[*] Circuit Judges.

CARNES, Chief Judge:

_____

[*] Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation.

When it comes to wireless communications technology, people are anything but consistent. While we ardently embrace the blessings of that technology and demand ready access to it in every aspect of our daily lives, many of us recoil at the thought of having in our hometowns the unsightly towers that make the technology possible. "Anywhere but here," is the way we seem to view them.

This inconsistency appears to be alive and well in the City of Milton, Georgia, population 33,000. Milton's logo is not a cell tower but a galloping horse, and for good reason. It is a picturesque place that is home to seventy equestrian estates, where horses roam and graze in green pastures, and it has a number of non-equestrian estates as well. Thirty-nine percent of the houses in Milton are valued at $500,000 or more, and seven percent of them are valued at or above a million dollars.[1] The mean family income exceeds $172,000.[2] From the demographics one can infer that the well-to-do residents of Milton see their hometown as a good place to live the good life.

And one can certainly infer that Miltonians enjoy a lot of wireless communications technology. Last year, eighty-eight percent of American adults owned a cell phone, which more than half of them used not only as a phone but

---

[1] See Milton, GA, American Factfinder, United States Census Bureau, http://factfinder2.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_11_5YR_DP04 (last visited Aug. 30, 2013).

[2] Id. at http://factfinder2.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_11_5YR_DP03 (last visited Aug. 30, 2013).

also for access to the internet.[3]  Ninety-eight percent of Americans whose household income is $150,000 or more own at least one cellphone.[4]  Given the relative affluence of Milton, the city obviously is teeming with cellular devices and bustling with their usage.  It is not, however, teeming with enthusiasm for cell towers or bustling with people who would welcome them.  Instead, it seems Milton fears that with cell towers paradise will be lost.

In order to furnish wireless telephone service, providers have to locate antennas and network communications equipment in facilities called "cell sites," some of which are located on cell towers.[5]  In 2012 there were 301,779 cell sites in this country.[6]  As cell phone use increases, more sites and towers are necessary to accommodate the increased usage.

The paradoxical desire for a landscape free from cell towers in residential areas saturated with wireless communications is one of the conflicts that Congress addressed in the Telecommunications Act of 1996.  The general purpose of the Act is "to promote competition and reduce regulation in order to secure lower prices

---

[3]  Aaron Smith, Cell Internet Use 2012, Pew Research Ctr. Internet & Am. Life Project, June 26, 2012, at 2, available at pewinternet.org/~/media//Files/Reports/2012/PIP_Cell_Phone_ Internet_Access.pdf (last visited Aug. 30, 2013).

[4] Aaron Smith, Smartphone Adoption and Usage, Pew Research Ctr. Internet & Am. Life Project, Jul. 11, 2011, at 8, available at pewinternet.org/~/media//Files/Reports/2011/PIP_ Smartphones.pdf (last visited Aug. 30, 2013).

[5] See Wireless Glossary of Terms, CTIA, available at http://www.ctia.org/advocacy/ research/index.cfm/AID/10320 (last visited Aug. 30, 2013).

[6] CTIA Semi-Annual Wireless Industry Survey, available at http://www.ctia.org/ advocacy/research/index.cfm/AID/10316 (last visited Aug. 30, 2013).

and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Pub. L. No. 104–104, 110 Stat. 56, 56 (1996); see also H.R. Conf. Rep. No. 104–458, at 113 (1996), reprinted in 1996 U.S.C.C.A.N. 10, 124 (describing the Act's purpose of providing "a procompetitive, de-regulatory national policy framework" that opens telecommunications markets to competition). Part of the Act is specifically designed to balance that national interest in telecommunications growth with the local interest in zoning control.

The Fourth Circuit has aptly explained how this balance is struck. Under the Act the "authority to regulate siting and construction of telecommunications towers is preserved in state and local governments, but these decisions are subject to certain limitations." 360 degrees Commc'ns Co. of Charlottesville v. Bd. of Supervisors of Albemarle Cnty., 211 F.3d 79, 86 (4th Cir. 2000) (citations omitted). Among those limitations are "prohibitions against discriminating among wireless service providers and against banning personal wireless services altogether." Id. The Act "also requires local governments to act on permit applications within a reasonable period of time and not to deny applications except in writing, and then only when supported by substantial evidence contained in a written record." Id. (quotation marks omitted). Finally, the Act "prohibits local governments from taking into consideration the environmental effects of radio

4

frequency emissions."  Id.; see also City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 115, 125 S.Ct. 1453, 1455 (2005) (explaining that one of the ways the Act sought to accomplish its purposes was through the "reduction of the impediments imposed by local governments upon the installation of facilities for wireless communications, such as antenna towers").

This appeal involves Milton's decision to deny T-Mobile's applications for permits to build three cell phone towers.  It requires us to interpret and apply the writing requirement of the Telecommunications Act:  "Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."  47 U.S.C. § 332(c)(7)(B)(iii) (emphasis added).  It seems as if it would be a simple matter to determine whether a local government's decision to deny a cell tower construction permit is "in writing."  After all, everyone knows what "in" means and everyone knows what "writing" means.  How much simpler and clearer could the statutory language be? As it turns out, however, those two words as they appear in the statute have been subject to some strikingly different interpretations by other courts of appeals, which are echoed in the parties' opposing positions in this case.

Milton contends that three letters it sent to T-Mobile are adequate decisions in writing when considered along with the minutes and transcripts of the city

5

council meeting and hearings on the applications which, at least collectively, detail the reasons two of the applications were denied and the third one was only conditionally approved.  T-Mobile, however, contends that the letters themselves are inadequate and that the hearing transcripts and minutes cannot be used to supplement them because the denial of a permit must be in a writing that is separate from any other documents in the record and that itself adequately sets out the reasons for the denial.

## I.

Those are the contentions, here are the facts.  T-Mobile South, LLC wanted to build three cell phone towers in Milton so that it could provide reliable in-home cell phone service for its existing customers in that area.  In November 2009 it applied to the City of Milton for use permits to construct the three towers.  One of them was to be 149 feet tall while the other two would be 154 feet tall.  The three locations where T-Mobile proposed to build the towers in Milton were:  the "Mountain Road" location, a 10-acre horse farm with a single-family residence; the "Cogburn" location, a 26-acre horse farm with a single-family residence; and the "New Providence" location, a 51-acre tract including a utility easement with power transmission poles and lines and with single-family residences adjacent to it.

Because each of the three properties where T-Mobile wanted to locate its towers is zoned "agricultural," Milton's zoning regulations required T-Mobile to

get a use permit in order to build the towers.  Along with its applications for use

permits, T-Mobile sent letters to Milton stating that it was able to make "favorable

arrangement[s]" with the landowners for locating the towers on their land and that

it was seeking the permits so that it could begin construction.

On March 23, 2010, T-Mobile's applications were each separately

considered at a public hearing before the city planning commission. T-Mobile

hired a court reporter to take down and transcribe the proceedings.  The transcripts,

which were produced soon after the hearing, show that the same procedure was

used for each application.  First, the application and an engineering report were

read.[7]  T-Mobile's representative then discussed the permit applications and spoke

in favor of them.  There was an opportunity for public comment, and most of the

citizens who spoke opposed the proposed towers, although some voiced support.

After the public comment part of the hearings concluded, members of the

planning commission asked questions of the T-Mobile representative.  At the end

of the discussion period for each of the applications, the planning commission

voted unanimously to recommend denial.  And that is what it did — recommend

that the city council deny all three applications.

On April 26, 2010, the mayor and city council held a public hearing to

consider each of T-Mobile's three applications, and the part of the hearing relating

---

[7] The transcript indicates that the engineering report was presented by a representative of
an independent consulting company hired by the City of Milton to evaluate the applications.

7

to each one was recorded and separately transcribed, just as each part of the planning commission's hearing was. The city council hearing followed the same basic format or procedure that the planning commission hearing had.

First, Milton's community development director presented the application to the council and stated that the community development staff and the planning commission had recommended denial. Then a representative of the independent consulting company that the City had hired to evaluate the applications read into the record the company's engineering reports. The consulting company recommended denial of the applications for the Mountain Road and Cogburn locations. For the New Providence location, however, the consulting company recommended "approval with conditions." It explained that because the power company would not allow an antenna to be placed on the existing power line poles at that location, "putting a tower next to the existing pole aesthetically is probably going to be the smallest impact on the area possible."

After each engineering report was read, T-Mobile's representative discussed the permit application and spoke in favor of it. Then there was an opportunity for public comment, and, just as had happened at the earlier planning commission hearing, most of the citizens who spoke opposed the proposed towers, although

8

some voiced support.[8]  After the public comment part of the hearing concluded, the city council had the opportunity to ask questions and discuss the applications.  At the end of each discussion period, a motion was made concerning the individual application under consideration.

For the Mountain Road location, a council member moved to deny the use permit application and stated on the record five "not exhaustive" reasons for denial:

> One, due to failure by the applicant to submit a certified statement that the structure will meet the applicable design standards for wind loads as required by Section 19.2.7[9] of the Milton zoning code and as the applicant was further instructed at the Planning Commission.  The applicant was advised at the Planning Commission hearing to have such data submitted to the City by April 9th, 2010.  As of today's date, the applicant has not submitted such required data.

> Two, the proposed tower is inconsistent with the adjacent land use as a single-family residence on large agricultural parcels and incompatible based on the location of the tower to adjacent residential structures.

> Three, the proposed cell tower is inconsistent with the surrounding scale, transition of densities, and does not protect the existing rural character of Milton.

---

[8] At the city council meeting and hearings, only two Miltonians voiced support for the tower permit application for the Cogburn location.  One of them said the tower would not be too bad if it looked like a pine tree.  The other one was, not surprisingly, one of the landowners with whom T-Mobile had negotiated "favorable arrangement[s]" in exchange for locating the towers on his land.  He explained that he was having trouble paying for taxes and insurance on his farm, and the lease with T-Mobile could enable him to keep the farm, which local children liked to visit in order to pet the animals.

[9] Another council member later pointed out that the motion should have referred to Milton ordinance 19.4.7 instead of 19.2.7.

Four, for all of those reasons supporting denial set forth in the March 22nd, 2010, Georgia Tax and Regulatory Solutions, LLC, letter to the City of Milton Planning Development Division which is incorporated by reference into this motion and attached as Exhibit 5.

Number five, as well as the multitude of other reasons stated here this evening by those citizens impacted as well as those that would be similarly impacted. I further request that this motion be placed into the record of tonight's meeting.

The application for a permit to construct a cell phone tower at the Mountain Road location was denied. The vote was unanimous.

For the Cogburn location, a council member moved to deny the use permit application and stated on the record some "non-exhaustive" reasons for denial that were substantively identical to the first four reasons that had been stated for denial of the application for the Mountain Road location. The application for a permit to construct a cell phone tower at the Cogburn location was denied by unanimous vote.

For the New Providence location, a council member moved to approve the application subject to the following conditions: (1) T-Mobile must submit a certification from a registered engineer that the structure will meet the applicable design standards for wind loads, and submit construction drawings signed and sealed by a licensed structural engineer, and (2) the tower must be built as a "stealth" design approved by the community development manager and must not be taller than one-hundred feet. That motion was approved by unanimous vote.

10

After the city council hearing, three separate letters were sent to T-Mobile notifying it of Milton's decision, one letter about each application. The letters denying the applications for use permits at the Mountain Road and Cogburn locations were dated April 28, 2010, and did not recite the reasons why those applications were denied. Each one simply stated that the application was denied.

A letter dated April 29, 2010, informed T-Mobile that the New Providence application had been approved subject to several conditions, including T-Mobile agreeing to restrict the use of the property to "one monopole communications tower and equipment slab(s) and/or buildings," agreeing to the tower being a "stealth design" subject to approval by the community development director, and agreeing that the tower would not exceed one-hundred feet. The approval of that tower was also conditioned on T-Mobile's agreement to abide by several other aesthetic considerations that were set out in the letter.

In addition to being recorded and transcribed, the city council meeting and hearings, including the action the council took on the applications, were memorialized in sixty-five pages of minutes. Those minutes, like the transcripts of the hearings, detail the reasons given in support of and in opposition to each application, and the motions and their grounds, and recite the unanimous vote on them. This is the chronology: the council meeting and hearings were on April 26, 2010; the two denial letters were dated April 28 and the one conditional approval

11

letter was dated April 29; the transcripts of the council meeting and hearings were certified by the court reporter on May 4; the minutes were approved by the council on May 17.

## II.

On May 27, 2010, T-Mobile filed a lawsuit against the City of Milton alleging violations of the Telecommunications Act of 1996 and seeking injunctive relief. The lawsuit challenged the denial of the applications for cell phone tower construction permits at the Mountain Road and Cogburn locations. It also challenged the conditional approval of the application for a construction permit for the New Providence Road location on the theory that the conditions put on approval effectively made it a denial.[10] T-Mobile claimed that Milton's action on each of the three permit applications violated four provisions of the Act: 47 U.S.C. § 332(c)(7)(B)(iii) (requiring that denials of applications be "in writing and supported by substantial evidence contained in a written record"), 47 U.S.C.

---

[10] When the final action of a state or local government adversely affects a wireless service provider, it may "commence an action in any court of competent jurisdiction," claiming a violation of the Telecommunications Act. See 47 U.S.C. § 332(c)(7)(B)(v). T-Mobile contends, and we agree, that Milton's conditional approval of its application for a permit to construct a tower at the New Providence location is a final action adversely affecting it — the adverse effect being the conditions placed on approval. And T-Mobile's lawsuit was timely filed on May 27, 2012, based on the action that Milton took on all three applications, regardless of whether the thirty-day period for filing started running on the date of the denial letters (April 28 and April 29, 2010) or on the date the city council approved the minutes of the hearing at which the action was taken on the permit applications (May 17, 2010). See id. (setting a thirty-day time limit for commencing an action under the Act).

12

§ 332(c)(7)(B)(i)(II) (forbidding local authorities' "regulation of the placement, construction, and modification of personal wireless service facilities" in a way that prohibits or effectively prohibits the provision of wireless services), 47 U.S.C. § 332(c)(7)(B)(i)(I) (prohibiting unreasonable discrimination among wireless providers), and 47 U.S.C. § 253 (providing in part that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service").

The district court decided to first consider the claim that Milton's actions on the permit applications violated 47 U.S.C. § 332(c)(7)(B)(iii), which requires denials to be "in writing and supported by substantial evidence contained in a written record." The court stayed discovery and a ruling on the other claims while resolution of that one was pending. T-Mobile filed a motion for partial summary judgment, contending that the denials and the conditional approval were neither "in writing" nor "supported by substantial evidence contained in a written record." Milton opposed that motion.

On June 24, 2011, the district court entered an order concluding that Milton had not met the writing requirement of § 332(c)(7)(B)(iii) with its denials of the permit applications for the Mountain Road and Cogburn locations "[b]ecause [Milton's] written decisions did not include any reasoning." It concluded that the

conditional approval of the application for the New Providence location was effectively a denial, which also failed to satisfy the writing requirement because it did not set forth any reasons for imposing the conditions it listed.

The district court then addressed the substantial evidence requirement and observed: "Both parties appear to agree that the applications were denied or conditionally approved for two primary reasons: (1) because the applications lacked a wind load certification as required by [Milton's] ordinance; and/or, (2) for aesthetic reasons raised by both council members and concerned citizens." The court found, however, that because Milton did not satisfy the writing requirement, it could not "readily discern which motivation [Milton] relied upon." For that reason, the court stated it would "not perform a post-hoc guessing game" but instead would "require [Milton] to adequately state in writing the basis for its denial." Without ruling on whether the substantial evidence requirement had been met, the court "remand[ed]" the matter to Milton to "adequately state in writing its grounds for denial and/or conditional approval." The court did not reach any of T-Mobile's three other claims.

On July 19, 2011, about three weeks after the district court entered its "remand" order and in response to it, Milton sent three letters to T-Mobile, one for each of the applications. Each letter listed the reasons for Milton's actions on that particular permit application, which were the same reasons that had been stated on

14

the record when the motions were made at the city council hearings to deny (or conditionally grant) the applications and that were reflected in the minutes of the meeting. Each letter stated, as the motions at the hearings had, that T-Mobile had failed to comply with the zoning code requirement that it provide a certified statement that the proposed tower met the applicable design standards for wind loads. The letters pointed out that T-Mobile had failed to do so even after being reminded at the earlier planning commission hearing that it was required.

On July 22, 2011, three days after Milton sent its post-remand letters detailing the reasons for the denials of two of the applications and for placing conditions on approval of the third one, T-Mobile moved for reconsideration of the district court's June 24 remand order, asking the court to "reopen the case." In its motion T-Mobile contended that remanding the matter to Milton in order to give it an opportunity to state the reasons for its decisions on the use permit applications violated the Telecommunications Act's requirement that these cases be decided on an expedited basis. T-Mobile argued that a permanent injunction requiring Milton to grant the permit applications was the only proper remedy for a violation of the § 332(c)(7)(B)(iii) writing requirement.

On December 28, 2011, which was about six months after the district court had issued its first order, it issued a second one, granting T-Mobile's motion for reconsideration and its request for a permanent injunction. Agreeing with T-

15

Mobile, the court stated that "to allow a remand is to encourage local governments to issue inadequate denials so that they will be able to continue to frustrate expediency by getting a second bite at the apple." The court reasoned that "[r]emanding, even in a case such as this where there is some evidence of a legitimate denial-reason, is counter to Congress' clear mandate of expedient review and creates improper incentives."[11]

The district court concluded that an injunction requiring approval of the applications is the proper remedy for a violation of the Telecommunications Act's writing requirement. The court decided that each of the factors to be considered in determining whether an injunction should be issued favored issuing one in this case. It found that T-Mobile had established that it succeeded on the merits and there were no adequate remedies at law. It determined that the balance of hardships weighed in T-Mobile's favor because "the only way to achieve better cell service is to install additional towers." Finally, it concluded that the public interest "would not be disserved" because "the public will be able to enjoy stronger

---

[11] We have not decided what remedies are available for a violation of the writing requirement: should the matter effectively be "remanded" to the local authority in order to give it another chance to comply with the writing requirement, or is the only proper remedy an injunction ordering that the application be granted? In Preferred Sites, LLC v. Troup Cnty., 296 F.3d 1210, 1222 (11th Cir. 2002), we decided that an injunction is an appropriate remedy for failure to satisfy § 332(c)(7)(B)(iii)'s substantial evidence requirement, but that decision did not purport to hold anything about the remedy for a violation of the writing requirement. See id. at 1218 n.8 (not deciding whether there was even a violation of the writing requirement in that case). As in Preferred Sites, we are not deciding in this case what would be the proper remedy if there had been a violation of the writing requirement.

16

cell reception, an interest which Congress has determined is valuable." As a result, the court permanently enjoined the City from denying T-Mobile's applications "subject to [T-Mobile] producing proper wind-load certifications for each site." This is Milton's appeal from that judgment.

### III.

The City of Milton's denial of two of T-Mobile's construction permit applications and its conditional approval of the third application are clearly set out in the three letters it sent, one for each of the three applications. Each letter unambiguously states Milton's decision on the application it addresses. The reasons for those decisions are detailed in the 181-page transcript of the city council's hearings on the applications and in the sixty-five pages of minutes of the council meeting and those hearings. The transcript and the minutes set out the discussion, the motions that were made on each application, the reasons stated for each motion, and the vote on it. T-Mobile had, or at least had access to, the three letters, the transcript of the hearings, and the minutes at the time it filed this lawsuit. [12]

---

[12] The writing requirement applies to decisions denying permit applications. See 47 U.S.C. § 332(c)(7)(B)(iii) ("Any decision . . . to deny a request . . . shall be in writing . . . .") (emphasis added). T-Mobile contends that a decision to approve an application only conditionally is a denial for this purpose, and Milton does not disagree. Because of that, and because it does not matter to the result, we will treat the conditional approval of the New Providence Road application as a denial for present purposes.

17

T-Mobile cannot contend that the letters, transcript, and minutes are not in writing. Each one is. Nor can it convincingly contend that when considered collectively those documents fail to adequately convey the City's decisions on the applications and the reasons for those decisions.[13] Instead, the crux of T-Mobile's position is that the writing requirement of 47 U.S.C. § 332(c)(7)(B)(iii) can be satisfied only if the decision is announced or reflected in a written document that contains a statement of reasons and that is separate from any hearing transcript or minutes of a meeting or hearing. The statutory language does not say that, but T-Mobile would have us interpret the language that way, which is to say that it wants us to treat the language as though it said something more favorable to T-Mobile's position than it does. We can hardly blame T-Mobile for asking us to slant the language in its favor since some other circuits appear to have done that. They have done so in the face of the statutory language expressing the intent to preserve local authority over the location and construction of cell towers and other wireless facilities except where it is expressly provided to the contrary.

The Telecommunications Act of 1996 generally preserves local governments' traditional authority to make their own zoning decisions unimpeded by federal interference:

---

[13] T-Mobile does assert that because the motions referred to the listed reasons as "non-exhaustive," they were not stated with enough specificity. We are unpersuaded by that argument.

18

(7) Preservation of local zoning authority

(A) General authority

Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

47 U.S.C. § 332(7)(A); see also Am. Tower LP v. City of Huntsville, 295 F.3d 1203, 1206–07 (11th Cir. 2002) ("Land use decisions are basically the business of state and local governments.  The Telecommunications Act of 1996 . . . does not say otherwise.  The legitimate power of federal courts to interfere in the kind of zoning decision involved in this case is limited.") (citations omitted).

The Act does impose some limitations on the authority of state and local governments regarding the placement of wireless facilities.  The limitation relevant to this case is that:

(B) Limitations

*      *      *

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

47 U.S.C. § 332(7)(B)(iii) (emphasis added).

All that statutory provision requires of the denial decision is that it be in writing and be supported by substantial evidence in a written record.  Whether the

19

denials in this case were supported by substantial evidence in the written record is not before us, but the existence of that additional requirement necessarily means that there must be reasons for the denial that can be gleaned from the denial itself or from the written record; otherwise, there would be nothing for substantial evidence to support.  What is neither expressed nor implied, however, is any requirement that the reasons for a denial be stated in the letter or some other document that announces the decision, if there is a separate document doing that, or any prohibition against having the reasons stated only in the hearing transcript or minutes.

That is why the Fourth Circuit held that the writing requirement was satisfied by a two-page summary of the minutes of a city council hearing (describing the application, listing the names and views of all who testified, and recording the votes) along with a letter describing the application and stamped with the word "DENIED" and the date of the decision.  AT & T Wireless PCS, Inc. v. City Council of Va. Beach, 155 F.3d 423, 425, 429 (4th Cir. 1998); see also AT & T Wireless PCS, Inc. v. Winston-Salem Zoning Bd. of Adjustment, 172 F.3d 307, 311–13 (4th Cir. 1999) (holding that the writing requirement was satisfied by the zoning board's notice to the applicant that consisted of a copy of the first page of the application with the word "denied" written on it when considered along with a transcript and minutes of the zoning board's hearing).  The Fourth Circuit reasoned

that requiring more to satisfy the writing requirement would involve rewriting the statute.  See Va. Beach, 155 F.3d at 429–30.

Other circuits have disagreed with the Fourth and have, to one degree or another, expanded the writing requirement into a "separate writing" or "separate writing with explanation of reasons" requirement.  See Sw. Bell Mobile Sys., Inc. v. Todd, 244 F.3d 51, 60, 63 (1st Cir. 2001) (requiring "a written denial separate from the written record" and one containing sufficient explanation of the reasons to allow "meaningful judicial review," but finding that a zoning board's "short written decision" was enough even though it contained "little explanation and few facts"); New Par v. City of Saginaw, 301 F.3d 390, 395–96 (6th Cir. 2002) (requiring that the written decision be separate from the record, describe the reasons for the denial, and contain a sufficient explanation to allow a court to evaluate it against the evidence in the record); Omnipoint Holdings, Inc. v. City of Southfield, 355 F.3d 601, 606–07 (6th Cir. 2004) (distinguishing the Todd decision, which involved a zoning board decision, and holding that a formal city council resolution stating the reasons for denial of the application satisfied the writing requirement); MetroPCS, Inc. v. City & Cnty. of S.F., 400 F.3d 715, 721–23 (9th Cir. 2005) (requiring a written denial separate from the written record with sufficient explanation to allow for judicial review, and holding that a five-page written decision separate from the record, which summarized the facts, recounted

21

the proceedings, articulated the reasons, and explained the evidentiary basis for the denial, was sufficient); see also Helcher v. Dearborn Cnty., 595 F.3d 710, 717–19 (7th Cir. 2010) (requiring "a sufficient explanation of the reasons for the permit denial to allow a reviewing court to evaluate the evidence in the record supporting those reasons," without mentioning whether the written explanation had to be separate from the record, but holding that the seventeen-page minutes of a zoning board of appeals' meeting met that requirement).

In interpreting what the words "in writing" mean in § 332(c)(7)(B)(iii), we are reluctant to import into those words, as some of our sister circuits have, "more pragmatic policy values," MetroPCS, 400 F.3d at 722, than the words themselves bring along, or to take a more "pragmatic, policy-based approach," Helcher, 595 F.3d at 718, than the plain meaning of those words take. We are interpreting a statute, not designing one. Although we, like most judges, have enough ego to believe that we could improve a good many statutes if given the chance, statutory construction does not give us that chance if we are true to the judicial function. Our duty is to say what statutory language means, not what it should mean, and not what it would mean if we had drafted it.

The temptation for judges to give in to the cardinal sin of statutory revision instead of confining themselves to the task of statutory interpretation is a strong one. The strength of that temptation is captured in an observation, attributed to

22

H.G. Wells, that "[n]o passion in the world is equal to the passion to alter someone else's draft."  But the words of Congress don't come to us in draft form. They don't come to us for editing or revision.  They come to us as law.  Stated another way, "'we are not licensed to practice statutory remodeling.'"  Myers v. TooJay's Mgmt. Corp., 640 F.3d 1278, 1286 (11th Cir. 2011) (quoting United States v. Griffith, 455 F.3d 1339, 1344 (11th Cir. 2006)).  We must, instead, take the model that Congress has constructed, perceived defects and all.  See Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 228, 128 S.Ct. 831, 841 (2008) ("We are not at liberty to rewrite the statute to reflect a meaning we deem more desirable.");  Pavelic & LeFlore v. Marvel Entm't Grp., 493 U.S. 120, 126, 110 S.Ct. 456, 460 (1989) ("Our task is to apply the text, not to improve upon it.");  Friends of the Everglades v. S. Fla. Water Mgmt. Dist., 570 F.3d 1210, 1224 (11th Cir. 2009) ("[W]e are not allowed to add or subtract words from a statute; we cannot rewrite it.");  Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002) ("Our function is to apply statutes, to carry out the expression of the legislative will that is embodied in them, not to 'improve' statutes by altering them.");  Harris v. Garner, 216 F.3d 970, 976 (11th Cir. 2000) ("We will not do to the statutory language what Congress did not do with it, because the role of the judicial branch is to apply statutory language, not to rewrite it.").

23

Our oft-stated rule against judicial revision of statutes finds plenty of anchor weight in the bedrock principle that we are a country of laws, not one ruled by the musings, whether pragmatic or otherwise, of the black-robed class.  And there is another sound reason why judicial "improvement" of legislation, even in pursuit of a noble interest, is not noble.  Justice Holmes explained why courts should not change the rules of the game even when it seems that different rules might make more sense:  "[A]lmost the only thing that can be assumed as certainly to be wished is that men should know the rules by which the game will be played.  Doubt as to the value of some of those rules is no sufficient reason why they should not be followed by the courts.  Legislation gives notice at least if it makes a change."  Oliver Wendell Holmes, Jr., Holdworth's English Law, 25 Law Q. Rev. 412, 414 (1909), quoted in Richard A. Posner, The Essential Holmes 206 (1992). Judicial improvement of statutory language through aggressive interpretation is unfair to those whose actions satisfied the unimproved language but do not satisfy the "improvements" that the judiciary announces in the course of judging actions that have already been taken.  The actions of Milton's city council should be judged based on the rules of the game that were written into the Act when it acted, not by a new set of judicially refined rules that come out after the fact.  There is no better example of the importance of that than the district court's ruling that,

24

because Milton did not meet the writing requirement as the court interpreted it, Milton would be compelled to issue all three permits regardless of the merits.

The words of the statute we are interpreting require that the decision on a cell tower construction permit application be "in writing," not that the decision be "in a separate writing" or in a "writing separate from the transcript of the hearing and the minutes of the meeting in which the hearing was held" or "in a single writing that itself contains all of the grounds and explanations for the decision." See 47 U.S.C. § 332(c)(7)(B)(iii).  So, to the extent that the decision must contain grounds or reasons or explanations, it is sufficient if those are contained in a different written document or documents that the applicant is given or has access to.  All of the written documents should be considered collectively in deciding if the decision, whatever it must include, is in writing.

In this case the written documents available to T-Mobile include:  transcripts of the planning commission's hearings (one on each application), which include the recommendations the commission made and the reasons it made them; transcripts of the city council's hearings (one on each application) recounting the motions that were made and the reasons that were given for denying or conditionally approving each of the applications; the letters the City of Milton sent to T-Mobile two or three days after the city council hearing stating that two of the permit applications were denied and that one was approved subject to listed

25

conditions; and the detailed minutes of the city council hearings, recounting all of the reasons for the action on each application along with the relevant discussion. T-Mobile had access to all of those documents before its deadline for filing the lawsuit, and collectively they are enough to satisfy the writing requirement of § 332(c)(7)(B)(iii).[14]  We need not consider whether something less than or different from all of those documents would be enough.

**REVERSED AND REMANDED.**

---

[14] The record on appeal also contains the letters Milton sent to T-Mobile denying (or conditionally approving) its permit applications about three weeks after the district court had first determined that Milton had not met the statutory writing requirement and "remanded" the case to Milton so that it could do so.  We have not considered those letters.  Even without them, there was enough to satisfy the writing requirement in this case.